Med-Mar, Inc. *v.* Dilworth et al., Appellants.

Argued March 17, 1969. Before WRIGHT, P. J., WATKINS, MONTGOMERY, JACOBS, HOFFMAN, and CERCONE, JJ. (SPAULDING, J., absent).

*Roland J. Christy,* for appellant.

*Paul W. Callahan,* with him *Fox, Differ & DiGiacomo,* for appellee.

Opinion by Cercone, J., June 12, 1969:

The plaintiff, Med-Mar, Inc., filed suit in assumpsit February 10, 1964, seeking recovery of damages from its architect for defective construction of the roof of a building erected to house medical offices at Drexel Hill, Pennsylvania. At trial, defendant contractor Dilworth was removed from the case on motions and the trial proceeded against defendant architect Seidle alone.

The agreement with architect Seidle was oral and concerned, inter alia, the supervision of construction of the building in accordance with plans and specifications. Twenty-five (25%) percent of Seidle's fee was allotted as payment for this phase of his work, and upon completion of the building in December of 1954, he was paid in full for all his work. The total cost of the construction of the building was twenty-five thousand eight hundred and fifty ($25,850.00) dollars.

In the Spring of 1963, the owners and occupants of the building noticed a strong, pungent odor permeating the interior of the building and called in Seidle, and later others, to inspect and locate, if possible, the source of the malodor. Upon investigation,

the stench was discovered to be coming from the roof where moisture penetration had deteriorated or rotted certain parts of the roof. According to the plans and specifications, a 3/8″ layer of fir plywood covering was to have been placed over the roof joists and in turn to be covered by a 2″ thickness of Celotex. It was discovered that the plywood sheathing had not been installed, and that, without the plywood support, the Celotex softened and sagged between the roof joists. This sagging caused the outer four-ply composition type roof covering to also buckle and open in some sections causing moisture to enter the entire roof area. As a result, the moisturized Celotex emitted the acrid smell complained of by plaintiff. The damage was so extensive that a new roof became the only solution to the problem and, after due notice to Seidle, and after his refusal to remedy the situation, the plaintiff installed a new roof at the cost of $6,476.82, for the recovery of which this action was brought. At trial, the jury returned a verdict of $6,000.00 against defendant-architect and this appeal follows from the denial of defendant's motion for judgment n.o.v. and motion for a new trial.

Defendant's first contention is that the six-year Statute of Limitations, under the Act of 1713, March 27, 1 Sm. L. 76, Section 1, began to run from the time of the completion of the building in December 1954, and therefore, precluded the present cause of action which was begun on February 10, 1964, some nine years later.

The evocative question, therefore, is whether the six-year period began to run upon completion of the building in December of 1954 or at the time the defect became known to the plaintiff in the Spring of 1963.

The general rule is that the Statute begins to run from the time the act is done, but this is not of uni-

versal application. The mischief the Statute intends to remedy is the delay in the assertion of a legal right which it is practical to assert. The limitation of action prevents the starting of a lawsuit at a time when it is impractical or impossible for the parties to present themselves in court with the necessary factual and legal implementations which were at one time available to them. In other words, it is intended to preclude one who has slumbered for six years during which time legal process was within his reach.

The legal principles in this field, both general and particular, are succinctly stated in the case of *Schaffer v. Larzelere,* 410 Pa. 402 (1963): "Under the law of Pennsylvania, it is the duty of one asserting a cause of action against another to use all reasonable diligence to properly inform himself of the facts and . . . to institute the suit within the prescribed statutory period: Patton v. Commonwealth Trust Co., 276 Pa. 95, 119 A. 834 (1923); Turtzo v. Boyer, 370 Pa. 526, 88 A. 2d 884 (1952). Mere mistake, misunderstanding or lack of knowledge is not sufficient to toll the running of the statute: Ridgway's Account, 206 Pa. 587, 56 A. 25 (1903); McEnery v. Metropolitan Life Ins. Co., 50 Pa. D. & C. 395 (1944). If, however, through fraud or concealment, the defendant causes the plaintiff to relax his vigilance or deviate from his right of inquiry, the defendant is estopped from invoking the bar of the limitation of the action: Plazak v. Allegheny Steel Company, 324 Pa. 422, 188 A. 130 (1936) and Deemer v. Weaver, 324 Pa. 85, 187 A. 215 (1936). Likewise, if the existence of the injury is not known to the complaining party and such knowledge cannot reasonably be ascertained within the prescribed statutory period, the limitation does not begin to run until discovery of the injury is reasonably possible. See, Gotshall v. Langdon & Co., 16 Pa. Superior Ct. 158 (1901); Lewey v. Fricke Coke Co., 166 Pa. 536, 31 A.

261 (1895); Ayers v. Morgan, 397 Pa. 282, 154 A. 2d 788 (1959); Smith v. Bell Telephone Co. of Pa., 397 Pa. 134, 153 A. 2d 477 (1959)."

Or as stated by this court in *Scranton Gas & Water Co. v. Iron & Coal Company*, 167 Pa. 136 (1895), quoted with approval in *Ayers v. Morgan*, 397 Pa. 282 (1959): "The question in any given case is not what did the plaintiff know of the injury done him, but what might he have known by the use of the means of information within his reach with the vigilance the law requires of him?"

Therefore, where knowledge is impossible because of the laws of nature, or because of the actual fraud or concealment of the wrongdoer, or where it is impractical to impose on one who has been wronged the duty to explore and ferret out the undetectable act of the wrongdoer, the statute should begin to run from the time discovery of the injury is made. The law does not intend to bring about an unreasonable result. We travel at a rapid pace in today's world, and the realm of home and commercial building construction is no exception. The magnitude of operation in this field is altogether breathtaking in its scope and rapid range of activity. As a consequence it becomes, at times, an enervating and frustrating experience to attempt to get defective workmanship corrected. This may be understandable when one considers the ratio between the limited supply of and the great demand for labor. However, if faulty work is performed and it is of the nature that is ordinarily undetectable, the burden nevertheless should fall on him who has improperly performed and the statute should begin to run when his faulty work was or should have been discovered and not when it was completed.

The reasoning applied by the Supreme Court of Illinois in the case of *Van Buskirk v. Murden*, 22 Ill. 446 is strikingly pertinent here. In that case the

trial court had charged the jury as follows: "The jury are instructed by the court that an acceptance of the work, without objection and in satisfaction of the contract by the plaintiff, was a waiver in law of all defects that may have been in the plastering of plaintiff's house, unless it has been shown that fraud and circumvention was used by defendant to induce the plaintiff to accept the same." Commenting on this instruction on appeal, the said Supreme Court said: "Everyone can see that this is too broad altogether, and well calculated to do great injustice, and is not the law. Had the court restricted it to visible defects, it would have been well. It is monstrous to say, in reference to plasterer's work, that all defects are waived when such work is accepted without objection and in satisfaction of the contract—all visible defects, or such as could be ascertained by inspection and examination, would be waived, but how can the employer tell by looking at a smooth coat of plastering, everything fair to the eye, whether the lathing had been done properly, or the mortar well made with due proportions of lime, sand and hair, to give it adhesion, hardness and durability. No man can tell, and therefore it is that the party should not be bound by an acceptance, or acceptance considered as a waiver of latent defects, which too often lurk in plastering, which to the eye appears very fine and unexceptionable."

Furthermore, it is unreasonable to require an owner—who has depended on and paid for his architect's supervision of the use and placement of the proper materials—to look for a hidden or latent defect, or to place upon him under such circumstances the burden of knowing of such defective workmanship at the time it was done rather than at the time it was discovered. There is little question that the trouble which developed in the roof in this case was the result of a latent defect. A "latent defect" is a hidden defect and gen-

erally involves the material out of which the thing is constructed: Words and Phrases. In this case the latent defect was the inherent structural weakness of ʹCelotex, which prevented it from performing the function intended without the plywood support.

In *Bloomsburg v. Sordoni Construction Company*, 401 Pa. 358 (1960), a case similar to the instant one, the insulation material in the roof became saturated, saggy and inefficient within a short time, and plaintiff recovered in a suit instituted eight and one-half years after installation of the roof.

In *Smith v. Bell Telephone Company*, supra, plaintiff recovered in a suit brought nine years after the installation of a conduit pipe by the Telephone Company which crushed his sewer line.

In *Ayers v. Morgan*, 397 Pa. 282 (1959), supra, plaintiff recovered against his doctor in a suit brought nine years after the performance of an operation during which a sponge was left in the plaintiff's body and remained undiscovered until after the two-year period provided in the Statute of Limitations had expired. The Court in that case said: "This statute, as all statutes, of course, must be read in the light of reason and common sense. In its application to a given set of circumstances, it must not be made to produce something which the Legislature, as a reasonable-minded body, could never have intended. The Statutory Construction Act of May 28, 1937, P. L. 1019, Article IV, §52, 46 P.S. §552, states that in ascertaining the intention of the Legislature the courts may be guided by the presumption that 'The legislature does not intend a result that is absurd, impossible of execution, or unreasonable.' . . . The plaintiff in the case at bar could hardly have launched his lawsuit on the day Dr. Morgan performed the operation because, at that time, no injury was yet inflicted. The injury became a reality when the sponge began to break down

healthful tissue within the body of the plaintiff. We said further in the Foley case [Foley v. Pittsburgh Des Moines Company, 363 Pa. 1 (1949)]: '. . . a right of action accrues only when injury is sustained by the plaintiff—*not when the causes are set in motion which ultimately produce injury as a consequence*: Pollock v. Pittsburgh Bessemer and Lake Erie R.R. Co., 275 Pa. 467, 473, 119 A. 547, 549; Rudman v. City of Scranton, 114 Pa. Superior Ct. 148, 152, 173 A. 892, 894.' " (Emphasis supplied.)

The language of the court in *Lewey v. Fricke Coke Company*, 166 Pa. 536 (1895) is apropos here. In *Lewey*, the defendant was charged with extracting coal from the plaintiff's land without his knowledge. When the plaintiff learned of the trespass he brought an action against the defendant who set up the defense of the Statute of Limitations since the taking had occurred some seven years prior to the filing of the action. The court, in holding for the plaintiff in a very well-reasoned opinion by Justice WILLIAMS, stated: "He (the plaintiff) must learn of such a trespass by other means than such as are within his own control, and until these come within his reach he is necessarily ignorant of his loss. He cannot reasonably be required to act until knowledge that action is needed is possible to him . . . to hold that the statute begins to run at the date of the trespass is in most cases to take away the remedy of the injured party before he can know that an injury has been done to him. A result so absurd and so unjust ought not to be possible . . . We are disposed to hold therefore that the statute runs against an injury committed in or to a lower stratum from the time of actual discovery, or the time when discovery was reasonably possible. . ."

Appellant relies on *Woodland Oil Company v. A. M. Byers and Company*, 223 Pa. 241 (1909), for his theory that the Statute of Limitations had run prior

to the time plaintiff instituted the present action. In that case, Byers sold iron casings to Woodland for use in drilling oil wells. After a substantial number of casings had been put into the well, the joint on one of the casings gave way and all the casings fell into the well causing Woodland to abandon further drilling operations. One Gormley, who did the drilling for Woodland, sued Woodland to recover his salary. Woodland joined Byers and together they defended the action which resulted in favor of Gormley. Thereafter, some eight years after the casings collapsed, Woodland sued Byers on a breach of an implied warranty. Judgment was returned in favor of Byers for the reason that the Statute of Limitations began to run when the defective casings were delivered to Woodland. However, Woodland is distinguishable from the present case. There was no hidden or concealed defect of which the plaintiff was unaware during the period when the Statute of Limitations would normally begin to run; there was no reason why it could not have ascertained the alleged defective condition within the period of the Statute of Limitations. Therefore, the court properly concluded that the Statute of Limitations had run its course when Woodland belatedly decided to sue Byers.

In the Pennsylvania cases which have held that the statute begins to run at the time work is completed rather than when the damage occurs, the courts invariably found that the plaintiff knew or should have known about the defective quality of the work at the time it was completed and that any lack of knowledge or ignorance on the part of the plaintiff was imputable to his failure to exercise the degree of vigilance required by the law.

In the instant case, the plaintiff neither had actual knowledge of the defect nor can we say it should have had knowledge thereof for the defect was not one which

could have been discovered by the exercise of ordinary and reasonable care.

We therefore conclude that under all the circumstances here listed, the statute began to run at the time the defective condition in the roof was discovered and consequently the plaintiff's action against Seidle was timely and within the provisions of the statute of limitations.

Seidle's second contention involves the propriety of two hypothetical questions asked by Mr. Callahan, counsel for plaintiff.

The law in regard to hypothetical questions is succinctly stated in *Murray v. Siegal,* 413 Pa. 23 (1963) at 30: "While hypothetical questions may be based on an assumed statement of facts, they may not be based on matters which do not appear in the record, or on facts not warranted by the evidence" citing *Keilbach v. Metropolitan Life Insurance Company,* 157 Pa. Superior Ct. 590 (1945); and *Zeigler v. Simplex Found. Co.,* 228 Pa. 64 (1910). In the *Keilbach* case, supra, the Court stated that 'Where expert testimony is offered by way of answers to hypothetical questions much must be left to the discretion of the presiding judge." citing 20 Am. Jur. 668.

We believe from a reading of the record in the instant case that a sufficient foundation was laid for the asking of the hypothetical questions and that the presiding judge was within his discretion in overruling appellant's objections.

The first question objected to was one asked of plaintiff's witness Irwin Winkleman on direct examination by Mr. Callahan: "Assuming that a roof was constructed of 2 x 6 rafters, upon which was laid 3/8 of an inch of plywood, and 2 inches of Celotex, and a 4-ply roof covering, and assuming that this 4-ply roof covering is properly maintained throughout the course of time, can you tell us in your opinion, how long the

rafters and out-lookers would remain structurally sound?"

Seidle contends that there is nothing in the record to indicate that the roof was properly maintained and hence that the hypothetical question was improper. However, if there was any improper maintenance of the roof which contributed to its deterioration, this was a matter of defense and in its absence, proper maintenance can be assumed. That the condition was not the result of any improper maintenance but the result of the defective work was clearly placed in evidence by the testimony of Mr. Supplee, a witness for plaintiff, who stated on direct examination that had the sheathing been laid on top of the joists and had the Celotex been laid on the sheathing and then the four-ply roofing laid on top of the insulation, the rotting would not have occurred in a period of eight and one-half years. Further, in answer to the question as to how long the joists and the out-lookers would have remained in sound structural condition, Mr. Supplee answered, "My lifetime, and longer, seventy-five years, fifty years, the life of the building."

Seidle also objected to a hypothetical question asked of plaintiff's witness Lawrence Carrol on cross-examination by Mr. Callahan: "Assuming we have rafters set on sixteen inch centers, that what once was the underbody, Celotex or similar material, has now fallen away for some reason, it has now fallen down between the rafters, with the result that the four-ply roof is resting directly upon the rafters, would that situation, or could that situation result in the opening up of the seams in the four-ply roof?"

We likewise find that this question was based on evidence appearing of record in the case and therefore the lower court properly overruled counsel's objection to this question. Mr. Supplee had testified when asked his opinion as to why the framing members in a roof

that was eight and a half years old would be in a rotted condition—"Well, I think in this instance it was caused by water. It was a wet rot. I think you could put your finger on the fact that by eliminating the insulation of the sheathing which would give support to the Celotex insulation, you would allow the water to come in there, running. One thing is related to the other. The fact that there was no sheathing gave the Celotex an opportunity to sag, and it sagged between joists, and pulled away from the metal capping, for one thing, at the edge. And by the same token, in sagging throughout the roof, it sagged a bit to allow the seams of the cover to open, which permitted the water to get into the Celotex. *Celotex isn't designed to have any structural strain of any degree. Any Celotex manufacturer specifies that the Celotex be supported by either gypsum, steel, or wood sheathing."* (Emphasis supplied)

We feel, as the Trial Court did, that neither of these hypothetical questions was improper.

Seidle next argues that the verdict of the jury was based on conjecture and that the facts are insufficient to support the verdict. Appellant contends that the opinions of Messrs. Hudecheck and Supplee that the cause of the leak was the substitution of Celotex for plywood was conjecture. We find no reason to disregard their expert testimony. Seidle attempted to justify his failure to place plywood sheathing in the roof on the ground that the thicker layer of Celotex was an acceptable replacement. The jury however chose to believe plaintiff's witnesses and we find no reason for disturbing their verdict. They had the benefit of hearing and seeing the witnesses testify and they resolved the evidence in favor of the plaintiff.

In *Robbins v. Kaufman*, 415 Pa. 192 (1964), the court stated that ". . . we have often held that it is not necessary that every fact or circumstance point

unerringly to liability, it being enough that the jury have sufficient facts to say reasonably that the preponderance favors liability. . . ." Citing *Lewis v. United States Rubber Company,* 414 Pa. 626, 202 A. 2d 20 (1964); *Stimac v. Barkey,* 405 Pa. 253, 174 A. 2d 868 (1961); *Lear v. Shirk's Motor Express Corporation,* 379 Pa. 144, 152 A. 2d 883 (1959); *Smith v. Bell Telephone Company of Pennsylvania,* 379 Pa. 134, 153 A. 2d 477 (1959). In the case at bar the jury had sufficient facts to say reasonably that the preponderance of the evidence favored liability.

Seidle next claims that it was error to admit into evidence photographs taken of the roof more than a year after plaintiff discovered the damage. The law in regard to photographs is aptly stated in *Nyce v. Muffley,* 384 Pa. 107 (1956), wherein the court states at page 111: "The admission of photographs is a matter largely within the discretion of the trial judge. A photograph must be verified either by the testimony of the person who took it or by another person with sufficient knowledge to state that it fairly and accurately represents the object or place reproduced as it existed at the time of the accident, or if there is a difference or change, the difference or change is specifically pointed out and is readily capable of being clearly understood and appreciated by the jury": *Taylor v. Modena Borough,* 370 Pa. 100, 87 A. 2d 195; *Beardslee v. Columbia Township,* 188 Pa. 496, 41 A. 617.

The witness, Mr. Supplee, adequately verified the photographs. This can readily be seen from the following testimony (N.T. 74, 75): "Q. Mr. Supplee, do you recall when these pictures were taken? A. They were taken, I imagine it would be the first part of May, 1964. They were taken after we just started the work. Q. Can you tell us the relationship that exists between what is represented in those pictures and the condition as you visually inspected it that day? Is

there any difference between the two? A. No. It is pretty generally the same. Q. How about with reference to the pictures? A. We had already started to take the stuff apart. Q. The thrust of my questions is this, Mr. Supplee, with what degree of accuracy do these pictures represent—A. Oh, I think they represent pretty accurately the condition of the situation."

The court below properly noted, when overruling the defendant's objection to the photographs, that: "The court believes they (the photographs) are properly admissible. Again, the fact that they were taken a year later is a matter to be taken into consideration by the jury in viewing the pictures. But we do believe them to be relevant and admissible."

Seidle also seeks a new trial on the basis of alleged improper remarks made by the attorney for the plaintiff in his closing remarks to the jury. The law in regard to improper remarks was clearly stated by Judge WOODSIDE of this court in *Dura Seal Products Company, Inc. v. Carver,* 181 Pa. Superior Ct. 377 (1956) at page 381, wherein he said: "It is difficult for an appellate court to consider the impropriety of remarks which are not a part of the record and to which no reference is made in the record. Under such circumstances, we ordinarily would ignore the matter entirely. See Commonwealth v. Wilcox, 316 Pa. 129, 173 A. 653 (1934). . . . There are times, however, when the tone of counsel's address renders it prejudicial. Arguments to the jury become along with many other things a part of the atmosphere of the case. The atmosphere of a case is difficult to ascertain from the record. Narciso v. Mauch Chunk Township, 369 Pa. 549, 551, 552, 553, 87 A. 2d 233 (1952). It is composed not only of the words which are used, but also of the inflections of the voice and the conduct of the participants, even at times the audience reaction. In this connection, and in this connection alone, the

trial judge was entitled here to consider remarks of counsel which were not at the time thought serious enough to require objection by opposing counsel or warrant attention of the trial judge or to be made a part of the record. The trial judge who breathed the atmosphere of the case is far more able to determine whether the parties received a fair trial than we are. Ross v. Crisanti, 171 Pa. Superior Ct. 117, 90 A. 2d 299 (1952)."

In this case, the trial judge (Judge TOOTHMAN), an able and experienced jurist, did not feel that counsel's remarks were so prejudicial as to warrant a new trial. Since he had the benefit of hearing the remarks in the context in which they were uttered, and the effect it had upon the jury, we cannot say that in this case he abused his judicial discretion.

For all of the above reasons, we would affirm the judgment below.

DISSENTING OPINION BY MONTGOMERY, J.:

In my opinion, the actionable negligence of the architect in this case is distinguishable from the actionable negligence of the contractor. The breach of the contractor is his failure to follow the plans and specifications approved by the owner, resulting in a latent defect undiscoverable by the owner until the damage occurred. However, if there is any actionable negligence of the architect pleaded and proved in this case, it would consist not in active participation in a deviation from the plans and specifications but in failure to observe or discover such deviation. I would not extend the rules suspending the statute of limitations in the cases cited by the majority opinion against the architect in this case even though they well might be applicable against the contractor. Since, as the majority opinion states, the architect is not an in-

surer, I would extend the statute of limitations against him only when fraud or concealment are pleaded and proved, which was not done in this case. See 22 P.L.E. Limitation of Actions §64, for the cases requiring proof of fraud and concealment. I would, therefore, reverse the judgment in appellee's favor and order judgment entered in favor of the appellant, Joseph K. Seidle, Jr.

Therefore, I respectfully dissent.