CLUETT, PEABODY & CO., INC.

v.

CAMPBELL, REA, HAYES & LARGE, C. F. King, Inc., and Long-Service Co., Inc.

LONG–SERVICE CO., INC.

v.

CERTAIN–TEED PRODUCTS CORP., National Surety Corp., Owens-Corning Fiberglas Corp., Lexsuco, Inc. and John J. Albarano, d/b/a Penn State Construction.

Civ. No. 74–803.

United States District Court, M. D. Pennsylvania.

Jan. 31, 1980.

Joseph W. Swain, Jr., Philadelphia, Pa., for plaintiff.

Edward E. Knauss, III, Edward E. Knauss, IV, Harrisburg, Pa., Carl Rice, Sunbury, Pa., John C. Youngman, Williamsport, Pa., Jack R. Ream, Wentworth D. Vedder, Robert J. Brown, Kain, Brown & Roberts, John C. Uhler, York, Pa., James K. Thomas, W. E. Shissler & David C. Eaton, Harrisburg, Pa., John Albarano, Williamsport, Pa., for defendants.

## MEMORANDUM AND ORDER

NEALON, Chief Judge.

This matter comes before the court on defendants' summary judgment motions. Plaintiff, Cluett, Peabody & Co., Inc. (Cluett), seeks the cost of replacing the roof on a warehouse that it had formerly leased. Defendants, the architect, general contractor and roofing contractor involved in building the warehouse, contend (a) that the applicable statute of limitations bars this suit, and (b) that the real party in interest on any claim for the cost of replacing the allegedly defective roof is not the tenant of the warehouse, Cluett, but its owner, the

Shamokin Area Industrial Corporation (SAIC).[1]

Defendants' motions will be granted in part and denied in part. I conclude that plaintiff's claims concerning the *construction* of the roof had accrued more than six years prior to the commencement of this action and are therefore barred by the Pennsylvania six year statute of limitations, Pa.Stat.Ann. tit. 12, § 31 (1953) (Purdon).[2] Plaintiff's claim that the roof must be replaced because defendants failed to exercise reasonable care in attempting to *repair* the roof, however, accrued less than six years prior to the institution of this law suit and is therefore timely. Finally, since under the lease Cluett was obligated to replace the roof, it is a real party in interest to this action.[3]

## I. THE FACTS

On August 19, 1965, Cluett and SAIC executed a written 20 year lease for a tract of land situated in Ralpho Township, Northumberland County, Pennsylvania. Under the terms of the lease SAIC agreed to construct by September 1, 1966 a warehouse containing approximately 250,000 square feet of floor space. (Sections 1.1 and 2.2 of the Lease) In addition to payment of rent, Cluett agreed, *inter alia*, to maintain the warehouse and leased realty and "make all necessary repairs, interior and exterior, structural and non-structural, ordinary and extraordinary, foreseen and unforeseen." (Section 6.1 of the Lease)

The warehouse to be leased by Cluett was designed by defendant Campbell, Rea, Hayes & Large (hereinafter referred to as the architect). Under the terms of the agreement with SAIC dated April 22, 1965, the architect undertook to perform for SAIC professional services "consist[ing] of the necessary conferences, the preparation of preliminary studies, working drawings, specifications, large scale and full size detail drawings for architectural, structural, plumbing, heating, electrical, and other mechanical work; assistance in the drafting of forms of proposals and contracts; the issuance of Certificates of Payment; the keeping of accounts, the general administration of the construction contracts, and supervision of the work." (Article 1 of the Architect's Contract) In consideration for the performance of such services SAIC agreed to pay the architect in installments a basic fee amounting to 4 percent of the cost of the project. (Article 3 of the Architect's Contract) The architect's contract did not specify a date on which the architect would be released from his contractual commitments.

The contract for the general construction work on the warehouse, which included construction of the roof, was let on August 27, 1965 to defendant C. F. King, Inc. (hereinafter referred to as the general contractor). Under the terms of this agreement, the general construction work was to be completed by February 1, 1966, unless the architect granted an extension of time, (Article 2 of the general contractor's agreement) and the general contractor was obligated to remedy any defects due to faulty materials

---

1. Third-party defendants Certain-Teed Products Corporation, National Surety Corporation, Lexsuco, Inc. and Owens-Corning Fiberglas Corporation have moved for summary judgment on the grounds that the statute of limitations insulates them from liability and pretrial discovery absolves them from responsibility. These motions, which have been held in abeyance pending disposition of defendants' motions, will be disposed of by separate memorandum and order.

   By order dated June 5, 1979, the unopposed summary judgment motions filed on behalf of third- and fourth-party defendants Bethlehem Steel Corporation, Claster Steel Corporation, Cyclops Steel Corporation and American Bridge Company were granted and all third- and fourth-party complaints asserted against them were dismissed.

2. This statute, which governs the instant action, has been repealed. *See* Act of April 28, 1978, P.L. 202, No. 53, § 2(a) [807].

3. Plaintiff has moved (a) for sanctions against defendant Long Service Co., Inc. (Long) for Long's failure to timely file originals of deposition transcripts and deposition exhibits; (b) to strike Long's brief and deem its motions for summary judgment withdrawn; and (c) to strike the affidavit of George A. Long, Sr. These motions will be denied.

or workmanship that appeared within one year from either the date of final payment or the date of substantial usage or occupancy of the warehouse, whichever was earlier.[4] (Article 20 of the General Conditions, incorporated by reference into the general contractor's agreement) Payments to the general contractor were to be made under "certificates for payments" issued periodically by the architect upon application by the general contractor. No termination date was set out in the general contractor's agreement.

The general contractor on September 15, 1965 sub-let the construction of the warehouse roof to defendant Long Service Co., Inc. (hereinafter referred to as the roofing contractor). This agreement provided, *inter alia*, that "guarantees on sheet metal work and on all types of roofing . . . are limited to one year from date of completion." The roofing contractor was to be paid on a monthly basis with the final payments due thirty days from completion of the roofing sub-contractor's work. This agreement, like the architect's and general contractor's, contained no termination date.

The roof designed for the Cluett warehouse, sometimes described by the parties as a built-up roof, was constructed in layers. The bottom layer was a ribbed or fluted steel deck. A thin plastic-like sheet or vapor barrier made by third-party defendant Lexsuco was anchored to the roof deck by an adhesive also manufactured by Lexsuco. One and one-half inch thick fiberglas roof insulation, a product of third-party defendant Owens-Corning, was attached to the vapor barrier by the Lexsuco adhesive. Steep asphalt was then applied on top of the first layer of insulation board and a second layer of fiberglas roof insulation was laid. A layer of asphalt was placed on top of the insulation board and four layers of felt, a product of third-party defendant

Certain-Teed, were then applied. Coal tar pitch was spread between each layer of felt and on top of the last layer of felt. The last layer of coal tar pitch was covered with gravel. The roof was constructed in six sections with each section separated by an expansion joint.

The roofing contractor completed its construction work on the built-up roof on March 24, 1966 and the certificate of final payment was issued on September 12, 1966. (Lexsuco-Farrow deposition Ex. No. 2) Money was retained from the general contractor, however, until January of 1968 (Farrow, pp. 44–46, 139–143)[5] and the roofing contractor did not receive final payment on its agreement until January 19, 1968. (Long, Sr., pp. 14–15)

This money had been withheld because of problems with the roof. (Farrow, pp. 44–46) Almost immediately after Cluett occupied the building in May or June of 1966 (Farrow, p. 19) the roof began to leak and blister. (Stanner, pp. 7, 8 and 12). The problems of leaks and blistering were known by a number of Cluett employees. Edward Stanner, employed in the Cluett maintenance department, observed roof leaks in various sections of the warehouse every time it rained in 1966 and reported all such leaks to Donald Turley, Cluett plant engineer and Stanner's superior. (Stanner, pp. 7–14) In August of 1966, Turley received authorization to meet with representatives of the defendants and to inspect the roof to determine the source of the leaks. (Bannon, pp. 29–32). Turley observed that in 1966 most of the leaks were located near smoke vents installed in the roof. Cluett plant superintendent William Bannon and the general manager of plant distribution, Albert Nock, were also aware of the leaks in 1966. (Bannon, p. 33; Nock, p. 9) In addition, Oscar Tyree, manager of plant engineering for Cluett,[6] twice inspect-

4. The General Conditions do not specify how the date of "substantial usage" was to be determined.

5. References to deposition transcripts will simply identify the deponent and the page number of the transcript.

6. As manager of plant engineering, Tyree had received the plans and specifications for the built-up roof, (Tyree, pp. 12–13) had authority to direct the architect to reject sub-contractor's work (Tyree, pp. 57–58), and had the responsi-

ed the roof in the summer of 1966 and discovered what he believed to be poor workmanship in soldered junctions of the expansion joints. (Tyree, p. 101)

The architect contacted the general contractor who in turn informed the roofing contractor of these problems with the roof. The roofing contractor expended approximately 31 man hours in July, 1966 and 104½ man hours in September, 1966 attempting to remedy these matters. (Plaintiff Long, Jr. deposition Ex. No. 1)

Such repair efforts proved to be ineffective. In fact, during 1967 the conditions worsened. Stanner, Turley and Bannon recalled that the roof leaked in various sections of the warehouse throughout 1967. (Stanner, pp. 17–28; Turley, pp. 43–44; Bannon, p. 35) In January of 1967, gravel was missing on certain spots of the roof, flashings had separated from their joints, and pitch pockets, which were the areas where equipment stands entered the roof, did not appear to be functioning properly. (Hornbaker, vol. I, pp. 133–134). Turley also observed that in the summer of 1967 there had been some movement in the roof, (Turley, pp. 53–54) and Stanner noted in the fall of '67 some movement in the roof away from the drains. Also in 1967 Stanner observed blisters on all six sections of the roof and these blisters appeared to be larger than the ones he had noticed in 1966. (Stanner, p. 71)

By September of 1967, Tyree knew that the problems with the roof were serious. (Tyree, p. 121) In correspondence from the architect to third-party defendant Certain-Teed with a copy sent to Mr. Tyree the architect stated: "there is currently occurring a premature roof failure. . . . The problem of roof leaks has been a continual one. . . . There seem to be some differences of opinion as to the cause of the problem, which is taking considerable time to resolve." (Exhibit FFFF of Long's Second Request for Admissions) This con-

cern for premature roof failure was repeated in a letter dated July 11, 1967 from the architect to third-party defendant Lexsuco with copies sent to Tyree, Bannon and Turley (exhibit 43 of Long's Third Request for Admissions) and in a letter dated August 8, 1967 from the architect to third-party defendant Certain-Teed with copies also sent to Tyree, Bannon and Turley. (Long Exhibit No. 10 of Tyree deposition) Furthermore, a letter drafted by Certain-Teed chemist Lyle C. Haack, and forwarded by the architect to Tyree, suggested that the roof may have to be replaced and a new built-up roof fastened more securely to the steel deck. (Ex. Nos. 45 and 46 to Long's Third Request) [7]

Throughout 1967, the architect actively participated in efforts to make the roof water-tight. These efforts included corresponding with third-party defendant material suppliers and causing the general contractor to have the roofing contractor perform certain repair work. (Hornbaker deposition vol. I, pp. 148–150) In addition, a representative of the architect participated in at least two conferences held at the warehouse concerning the problems with the roof. (Plaintiff-Hornbaker deposition Ex. Nos. 9 and 10)

These conferences were also attended by the roofing contractor and the general contractor. In March, May and August of 1967 the roofing contractor expended considerable amounts of time in corrective work at the behest of the architect and general contractor. (Plaintiff Long, Jr. deposition Ex. No. 1) On October 3, 1967, the architect wrote to Tyree, stating, in part, "I wish to state that [the roofing contractor] and [the general contractor] have apparently made all corrections on the roof with specific reference to the perimeter where the condition existed." (Plaintiff-Hornbaker deposition Ex. No. 22)

bility of taking corrective action necessary to make the building fit for its intended purposes. (Tyree, p. 74)

7. By letter dated September 1, 1967, Haack apparently retreated from this position, stating that the roofing contractor's repair work may have obviated the need to replace the roof. (Exhibit WWWWW of Long's Second Request)

The roof, however, continued to leak. In a letter to the general contractor dated November 6, 1967, the architect stated in pertinent part:

There appears to be holes or possible fissures in the built-up plies permitting the water to enter. Therefore, we would suggest that you again have the roofing contractor return to the site to either re-roof those areas where these leaks developed or install additional plies of built-up roof in order to seal the leak.

I am sure that you, as the Prime Contractor, and your roofing sub-contractor are just as anxious to see that this roof is placed in a water-tight condition as the Owner and this firm. I assure you that we will do all we can to help expedite the completion of the project; however, it will never be done as long as the water keeps leaking into the building.

(Plaintiff-Hornbaker deposition Ex. No. 28)

Because problems with the roof had subsisted through 1967, the architect believed that the roofing contractor should extend its roofing guarantee for an additional year. (Plaintiff-Hornbaker deposition Ex. No. 24) By letter dated October 17, 1967, the roofing contractor offered to extend an additional year on their roofing obligations and this proposal was accepted by the architect. (Plaintiff-Hornbaker deposition Ex. Nos. 25 and 26).

The roof continued to leak throughout 1968. Stanner recalls that leaks appeared every time it rained in 1968. (Stanner, p. 42) In addition, the roof continued to blister and move. The number and size of the blisters again increased in 1968. (Stanner, p. 71) The roof appeared to move inward from the perimeter and away from the expansion joints that divided the roof into sections. (Stanner, pp. 30–33)

In May of 1968, Tyree and Bannon received copies of a report prepared by a consulting engineer firm concerning, *inter alia*, problems with the roof. This report stated in pertinent part:

Visual inspection shows many ridges (sometimes called 'alligator ridges') and blisters on all areas of the roof surface. Around the perimeter of the building the roofing has pulled back (at least relatively) from the fascia beams, tearing loose the flashing, the treated wood nailers and some brick courses.

.　　.　　.　　.　　.

Several theories can be advanced for the failure, which is very serious and must be remedied to prevent a complete roofing failure.

1. The fiberglas insulation, having a low "shear strength" has been unable to transmit the membrane shear stresses to the deck, as the membrane has contracted and then attempted to expand. As a result, the contractions have accumulated, causing the ridges and pulling away around the perimeter of the building.

2. Trapped moisture has been vaporized, causing the ridges.

3. The perimeter expansion movements have opened the edge seal and allowed moisture to enter the insulation and penetrate the entire roof.

4. The distances between roof expansion joints are too great.

5. Some material is inferior, faulty or incompatible and breaking down under service.

I feel that the major deficiency lies in theory 1 or 2, with the other factors possibly contributing to the problem.

.　　.　　.　　.　　.

I cannot suggest remedial action until further information becomes available. An entirely new roof (above the steel deck) may be required.

(Exhibit DDD of Long's Second Request)

Tyree agreed with the observation that the roof failure was serious and had to be remedied. Indeed, in a report dated May 10, 1968, entitled "The Elysburg Warehouse, Some of Its Faults," Tyree opined that the roofing felts had shrunk, causing "the breaking of mortar joints, the pulling away of the gravel stop from the peripheral steel, the ridges, the blisters, the loss of contact with cant strips, etc. etc." He recommended in this report that a "new roof covering" be installed. (Architect's Ex. No. 1 to Tyree deposition)

Correspondence received by representatives of Cluett prior to September 26, 1968, also pointed to the seriousness of the roofing problems. (See, for example, Exhibit 64 to Long's Third Request and Exhibits EEE, GGG, III, and JJJ to Long's Second Request) In one letter dated May 31, 1968 from the architect to the general contractor with copies sent to Tyree and Bannon the architect called attention to "the correction or replacement of the roof." (Ex. No. III to Long's Second Request)

This letter was one of a number written by the architect concerning the roofing problems. As in 1967, the architect continued to correspond with the general contractor to have the roofing contractor perform the corrective work. (See, for example, Plaintiff-Hornbaker deposition Ex. Nos. 35, 36, 43, 45, 46, 51) In a letter dated July 16, 1968, the architect's representative noted that there was evidence of premature roof failure and called upon the general contractor to "have your roofing sub-contractor and the manufacturer take the necessary steps to replace their material in accordance with the specifications and roof bond." (Plaintiff-Hornbaker deposition Ex. No. 46)

In October and November of 1968, the roofing contractor again expended considerable amounts of man hours attempting to repair the roof. By letter dated November 29, 1968, the roofing contractor advised the architect that the recommended corrective action had been taken. (Plaintiff-Hornbaker deposition Ex. No. 63)

An inspection of the roof in January, 1969, however, revealed that additional corrective work was necessary. By letter dated January 27, 1969, the architect wrote the general contractor specifying five items that required attention:

1. There is a leak in the roofing next to the skylight in the canopy at the main entrance.

2. There was still evidence of many air pockets in the roof plies, scattered over the entire roof.

3. There is still evidence of a roof leak at the middle of the building toward the front elevation and near a roof joint. There was also evidence that an attempt by the roofers has been made to locate this leak, but he has not as yet, corrected same.

4. There is again evidence that the wood plates on the tubular steel beams at the perimeter along the rear elevation are being pulled loose.

5. It was also noted that several leaks have developed around rain water conductors and a closer inspection revealed that the deck has pulled the top portion of the roof drains in a vertical plane as far as 1½" in the worst condition. In doing so, it has broken the seam between the two parts which then permits the water to leak into the interior of the building.

(Plaintiff-Hornbaker deposition Ex. No. 67)

Another inspection conducted by the architect in July of 1969 indicated that the condition of the roof had not improved. (Plaintiff-Hornbaker deposition Ex. No. 73) In October of 1969, the architect approved the roofing contractor's plan to repair the roof. (Plaintiff-Hornbaker deposition Ex. No. 78). This proposal consisted of the following:

We will remove basket-type strainers over roof drains, scrape away gravel and install a prefabricated liner furnished by the Lexsuco Company made of 3' × 3' Lexspand with a tube projecting 18" in the drain. This will be set in steep asphalt, edges stripped with two (2) ply 15 # felt and asphalt and coated with asphalt and gravel and replace strainers.

As shown in this section of the roof, starting 2' from the perimeter of each of the six sections of the main roof, we will install four (4) rows on 2' center # 14–4½" hex self-tapping coated steel screws with 1⅛" neoprene and coated steel washers. We will cover these with roofing cement and a 1' × 1' 43 # coated base sheet set in steep asphalt top coated with steep asphalt and gravel.

(Plaintiff-Hornbaker deposition Ex. No. 77) This proposed work was performed in October and November of 1969 and was finished

in the spring of 1970. (Long Sr., pp. 63–64, 70–74)

None of the corrective work performed on the roof ever completely remedied its problems. In 1969 and subsequent years the roof leaked, blisters proliferated, and the movement in the roof became more pronounced. (Stanner, p. 50; Turley, p. 114; Hornbaker, Vol. III, pp. 77–83) Corrective actions by the roofing contractor ended in the spring of 1970. It appears that the architect was not involved in the project from 1970 until April of 1973, when the architect corresonded with Certain-Teed. The Architect, however, did not prompt the general contractor or roofing contractor to take any additional corrective action at that time. (Plaintiff-Hornbaker deposition Ex. Nos. 80, 85, 86, 89)

This law suit was instituted on September 26, 1974. Cluett alleged breach of contract and negligence counts against each of the three defendants. Specifically Cluett charged (1) the architect with breach of its contractual obligations to design and supervise construction of the warehouse and to exercise the skill in its possession in designing and supervising construction of the warehouse and negligence in the design, selection of material, supervision of construction, and arranging for adequate repairs to the roof; (2) the general contractor and sub-contractor with breach of their warranties of fitness of the roof for its intended purpose;[8] (3) negligence of the general contractor in the construction of the roof, selection of a roofing sub-contractor, supervision of the roof construction, and repair of the roof; and (4) negligence of the roofing contractor in the construction and repair of the roof.

## II. STATUTE OF LIMITATIONS

At the time this action was instituted Pennsylvania applied a six year limitations period to actions for breach of contract and negligent injury to property. *See* Pa.Stat. Ann. tit. 12, § 31 (1953) (Purdon). The issue presented here is whether any of the causes of action asserted by Cluett accrued more than six years prior to September 26, 1974. Specifically, it must be determined when a cause of action for the cost of making the roof water-tight, including, if necessary, the cost of replacing the roof accrued as a result (a) of the defendants' actions in the construction of the roof and (b) their actions in the repair of the roof.[9]

To ascertain when a cause of action for negligence "accrues," Pennsylvania courts have applied what has aptly been described as the "discovery rule." *See, e. g., Schaffer v. Larzelere*, 410 Pa. 402, 406, 189 A.2d 267 (1963); *Ayers v. Morgan*, 397 Pa. 282, 288–89, 154 A.2d 788 (1959). This rule has been employed in actions claiming negligent building construction as well as in personal injury actions. *See, e. g., General State Authority v. Lawrie and Green*, 24 Pa. Cmwlth. 407, 356 A.2d 851 (1976); *DeMatteo v. White*, 233 Pa.Super. 339, 346, 336 A.2d 355 (1975); *Penn-Delco Union School District Authority v. M & L Construction Co.*, 60 D. & C.2d 226, 230 (Del. County 1972). Moreover, Pennsylvania has applied the discovery rule to actions charging misfeasance in the performance of contracts. *See Med-Mar, Inc. v. Dilworth*, 214 Pa.Super. 402, 406, 257 A.2d 910 (1969) (*allocatur refused*); *Spanard v. Duquesne Light Co.*, 118 Pitt.L.J. 354 (Allegheny County 1970); *Masi v. Pfahles*, 23 D. & C.2d 46 (Lawrence County 1960).

█ Under this rule the statute begins to run not from the date the negligent act or breach of contract is committed but from the date that injury resulting from the tortious or wrongful conduct is discovered or

---

8. It appears that Pennsylvania recognizes an implied warranty of fitness in construction contracts. *See Metropolitan Edison Co. v. United Engineers and Constructors, Inc.*, 4 D. & C.3d 473 (Philadelphia County 1977); *Skretvedt v. Maple Corp.*, 72 D. & C.2d 637 (Del. County 1974). *Cf. Elderkin v. Gaster*, 447 Pa. 118, 288 A.2d 771 (1972).

9. While Cluett maintains that this action seeks to recover the cost of replacing the roof, it must be noted that Cluett is only entitled to such damages as will adequately compensate the losses incurred as a result of defendants' conduct.

may be discovered by the exercise of reasonable diligence. *See* W. Prosser, Handbook of the Law of Torts § 30, at 144–45 (4th ed. 1971). The Court of Appeals for the Third Circuit has, in the context of a personal injury action, construed the Pennsylvania discovery rule to activate the statute of limitations only "from the time that plaintiff knows or reasonably should know the cause of his injury." *Bayless v. Philadelphia National League Club*, 579 F.2d 37, 39 (3rd Cir. 1978). That is, "the statute begins to run from the time that plaintiff, through the exercise of reasonable diligence, should have learned both the facts in question and that those facts bore some causative relationship to the injury." *Id.* at 40.

■ Application of the *Bayless* interpretation of the discovery rule to the facts of this case compels the conclusion that Cluett's causes of action for breach of contract and negligence arising out of the design and construction of the built-up roof accrued before September 26, 1968 and, therefore, are barred by the statute of limitations. The undisputed material facts are that the roof leaked almost immediately after Cluett took possession of the warehouse; it leaked continually and in several sections of the warehouse; blisters appeared over the entire roof and the number and size of the blisters progressively increased; the roof moved inward from the walls of the warehouse and away from the expansion joints; the roof movements were continual and became more pronounced with the passage of time; remedial efforts undertaken by the defendant prior to September 26, 1968 were unsuccessful; and finally, Cluett had received reports suggesting that a premature roof failure was occurring and that replacement of the roof may be required.

According to their deposition testimony, certain management personnel of Cluett clearly had knowledge of the problems with the roof, the extent of those problems, their possible causes, and the responsible parties. It is evident that prior to September 26, 1968, Cluett enjoyed a right to pursue an action for the costs of making the roof water-tight, including, if necessary, the cost of replacing the entire roof. Thus, its contract and negligence claims relating to the design and construction of the roof must be dismissed as untimely.[10]

This determination is consistent with the result reached in several state court decisions applying Pennsylvania law. For example, in *Med-Mar, Inc. v. Dilworth*, 214 Pa.Super. 402, 257 A.2d 910 (1969) (*allocatur refused*), an action in assumpsit against an architect was brought seeking the cost of replacing an allegedly defective roof. The court, in finding the action timely, ruled that the statute began to run when the faulty work was or reasonably should have been discovered. *Id.* at 412, 257 A.2d 910.

In *Penn-Delco Union School District Authority v. M & L Construction Co.*, 60 D. & C.2d 226 (Del. County 1972), the court confronted with an almost indistinguishable fact pattern from that presented here, declared an action alleging negligent construction of a roof time-barred. There, work on the construction of the roof for a school building was completed in September of 1959 and final payment was made on May 23, 1961. The roof leaked sometime after final payment and, despite repair efforts, problems with the roof became severe. The court held that the action, instituted seven years and five months after final payment, was untimely inasmuch as the record showed that "plaintiff was on notice of faulty construction in the roof by its constant leakage. . . ." *Id.* at 230.

---

**10.** Cluett has argued that the question of when its causes of action accrued must be left to the jury. Whether the statute has run on a claim, however, is generally a question of law for the judge. *See Smith v. Bell Telephone Co.*, 397 Pa. 134, 142, 153 A.2d 477 (1959). Only where the matter involves a factual determination should the issue be submitted to the jury. The material facts are not in dispute here and I believe it proper to determine the limitations question of whether Cluett knew or should have known of its injury and the cause or causes thereof on these summary judgment motions.

■ Nor does the fact that defendants in the instant action attempted to repair the roof within the limitations period compel a contrary conclusion. Under Pennsylvania law the statute of limitations is not tolled during the period the defendant insists that defects can be remedied. *See Bobo v. Page Engineering Co.*, 285 F.Supp. 664, 667 (W.D. Pa.1967), *aff'd*, 395 F.2d 991 (3rd Cir. 1968) (per curiam); *Lewis v. Jacobsen*, 30 D. & C.2d 623, 625 (Erie County 1962). As the trial court in *Penn-Delco*, 60 D. & C.2d at 230–31, observed:

> Confronted with the knowledge of the leakage, continual unavailing repairing, and imputed knowledge from plaintiff's engineer that the specifications were changed, plaintiff could only conclude that the roof was not constructed properly for some unspecified failure in workmanship or construction. Whereupon, good sense and ordinary reason, which is the diligence imposed, required that he pursue the problem to its source, and especially since he knew that the statute was running. He could not sit by and wait until it was too late. It is to prevent this and timely resolve litigation that the statute of limitations exists.[11]

Cluett tries to distinguish the above-cited cases by arguing that since none of the defendants contracts contained a termination date their contractual obligations to install an adequate roof continued until repudiated, which purportedly occurred less than six years prior to the commencement of this action. At page 75 of its brief, Cluett asserts:

> [T]he defendants were under a continuing duty to replace the roof if it could not be corrected. The defendants temporized, notwithstanding indications from Certain-Teed that the roof should be replaced and from [the consulting engineer] that it might have to be replaced. It was not clear that the defendants would not replace the roof until, in the case of the architect, in 1973; the general contractor, 1969 or 1970; and the roofing sub-contractor, 1970. Therefore, until those dates, plaintiff's cause of action was not complete and the statute of limitations did not begin to run.

In pressing this argument Cluett relies upon Pennsylvania cases applying the "continuing contract" theory. Cluett's reliance on this theory and the pertinent Pennsylvania decisional law is misplaced.

■ Even if it is assumed that, as Cluett seems to contend, the defendants were bound by contracts that could continue *ad infinitum*,[12] causes of action for negligent performance of those contracts and breach of warranty would have accrued *either* upon discovery of the negligent performance *or* termination of the contract, whichever first occurred. *See Thorpe v. Schoenbrun*, 202 Pa.Super. 375, 195 A.2d 870 (1963). *See generally* 22 P.L.E. *Limitations of Actions* § 56 (1959). In other words, at the point in time when Cluett either discovered or reasonably should have discovered that a serious roof problem existed and that

---

11. As the court in *Bobo v. Page Engineering Co.*, 285 F.Supp. at 667 recognized, I am not bound by these lower court opinions "and may independently find the law of the state in the absence of a decision of its highest court. [But] proper regard is to be given to the opinion of a lower Pennsylvania court, *Commissioner v. Estate of Bosch*, 387 U.S. 456, 465 [87 S.Ct. 1776, 1782, 18 L.Ed.2d 886] (1967)," and I believe these opinions adequately reflect the rule that would be adopted by the Pennsylvania Supreme Court were it confronted with this issue.

12. It must be noted that the conduct of the parties suggests that the *construction* obligation under the contracts terminated long before September of 1968. Cluett had occupied the building during the late spring of 1966; the final certificate of payment had been issued in September 1966; the general contractor's *maintenance* agreement had commenced when Cluett occupied the warehouse; in October of 1967 the parties considered that the roofing contractor was operating under its *maintenance* agreement; and final payment was received by the contractors in January of 1968. It also must be borne in mind that the maintenance agreements came into operation only upon *completion* of the construction. While maintenance obligations may have continued into the statutory period, they may not be used to bootstrap claims relating to the design and actual construction of the roof, as Cluett attempts to do here.

such problem was the result of either a defective design, faulty materials or poor workmanship, *it* or SAIC had the right to terminate this supposedly ongoing contractual relationship, obtain the services of other parties, repair or, if necessary, replace the roof, and institute appropriate legal action for recovery of the costs of such work.[13] It was not obligated to nor could it sit back and wait for the defendants to exhaust corrective efforts. Indeed, the unacceptable consequence of Cluett's argument is that a cause of action for breach of warranty or negligent performance of a continuing contract that contained no termination date would never accrue so long as the defendants periodically did some repair work, however ineffectual.

It should further be noted that Cluett has not cited, and the court's independent research has not disclosed, any decision that has applied the continuing contract theory to an action challenging the adequacy of the performance of a contract. The Pennsylvania cases in which the continuing contract theory has been applied sought payment for services that had been performed over a period of time that extended beyond the statutory period. *See Thorpe v. Schoenbrun*, 202 Pa.Super. 375, 195 A.2d 870 (1963) (contract to preserve defendant's eyesight); *Vanhorn v. Scott*, 28 Pa. 316 (1857) (contract to cultivate trees); *Newcomer v. Baxter Filtration Corp.*, 61 Lanc.L. Rev. 141 (1967) (contract for legal services).

*Cf. Van Sciver v. Van Sciver*, 337 Pa. 390, 12 A.2d 108 (1940) (support and maintenance agreement is a continuing contract but statute of limitations may bar recovery of sums due more than six years at the time the action is commenced). *See generally* 18 Williston on Contracts §§ 2028–2029 (3rd ed. 1978). This court does not believe that the Pennsylvania courts would apply the continuing contract theory to negligent performance of a contract and, accordingly, Cluett's invocation of the continuing contract theory will not be accepted.[14]

■ A cause of action concerning repairs attempted after September 26, 1968, however, is not time-barred. The issues with respect to negligent repairs are whether the defendants failed to exercise reasonable care in the actions that they had taken and whether such failure proximately caused the roof to fail. In other words, defendants, having undertaken efforts to repair the roof, whether or not contractually required to do so, owed Cluett a duty to exercise reasonable care and are liable for the consequences of their failure to exercise such reasonable care. *See Quinones v. United States*, 492 F.2d 1269, 1278 (3rd Cir. 1974); *Brown v. T. W. Phillips Gas & Oil Co.*, 195 F.2d 643 (3rd Cir. 1952); *Western Union Telegraph Co. v. N. C. Direnzi, Inc.*, 442 F.Supp. 1, 3 (E.D.Pa.1977); *Boyce v. U. S. Steel Corp.*, 446 Pa. 226, 230, 285 A.2d 459 (1971); *Pascarella v. Kelley*, 378 Pa. 18, 23, 105 A.2d 70 (1954); *Tarnogurski v. Rzepski*,

---

13. This result is consistent with *Moffat v. Metropolitan Casualty Ins. Co.*, 238 F.Supp. 165 (M.D.Pa.1964), in which the late Chief Judge Michael Sheridan of this court held that a cause of action for failure of an insurer to defend its insured accrued when the insured's cause of action was complete, i. e., when there was a final judgment against the insured in the action abandoned by the insurer. Cluett's cause of action was complete at the latest in May 1968 when the consulting engineer advanced five theories for the roof failure and suggested that the roof may have to be replaced. Cluett did not then demand, as it could have, replacement of the roof, but instead relied upon the defendants to remedy the situation. As noted above, the corrective work undertaken by defendants did not toll the statute of limitations under Pennsylvania law.

14. *Lehigh Electric Products Co., Inc. v. Pennsylvania National Mutual Casualty Ins. Co.*, 257 Pa.Super. 198, 390 A.2d 781 (1978), which Cluett asserts is dispositive of the statute of limitations issue, is inapposite. The issue there was whether work on a contract was performed within the statutory period for recovery on a contractor's bond. The court was not faced with the issue of when a cause of action accrued for negligent performance of a contract. Furthermore, the court intimated that if the record established that the work was in the nature of warranty service it could not be considered as performance of the original contract. The record *sub judice* clearly establishes that repair efforts undertaken in 1967, 1968 and 1969 by the defendants were in the nature of a warranty service and not rendered in performance of the agreement to construct.

252 Pa. 507, 510, 97 A. 697 (1916). *See generally* W. Prosser, Handbook of the Law of Torts § 56 (4th ed. 1971); Restatement (Second) of Torts § 323 (1965). This is not to suggest, however, that the defendants were obligated to take those actions that would have insured a water-tight roof. The question is not what they should have done to make the roof water-tight, but whether they were negligent in the actions they did take. *See* W. Prosser, Handbook of the Law of Torts § 56 (4th ed. 1971).

## III. THE REAL PARTY IN INTEREST

Rule 17(a) of the Federal Rules of Civil Procedure requires that every action be prosecuted in the name of the real party in interest. "The modern function of the rule in its negative aspect is simply to protect the defendant against a subsequent action by the party actually entitled to recover, and to ensure generally that the judgment will have its proper effect as res judicata." Advisory Committee Note to the 1966 Amendment to Rule 17(a), *reprinted in* 39 F.R.D. 84–85 (1966). Whether Cluett is actually entitled to recover the cost of replacing a roof it had formerly leased must be determined under the governing Pennsylvania substantive law. 6 C. Wright & A. Miller, Federal Practice and Procedure § 1543 (1971).

There appear to be two bases upon which to predicate a finding that Cluett is a real party in interest. First, Cluett assumed under the terms of the lease the normal incidents of ownership, *i. e.,* to *"make all necessary repairs, interior and exterior,*

*structural and nonstructural, ordinary and extraordinary, foreseen and unforeseen."* If repairs to be performed under this section of the lease were proximately caused by the negligence of a third party then Cluett in effect would be the injured party and enjoy the right to recover for the negligence of the third party.[15, 16]

And second, Cluett is an equitable assignee of SAIC's right to assert a cause of action for negligent injury to the warehouse. Under Pennsylvania law, "[t]he doctrine of equitable assignment, which is a particular application of the broad principle of subrogation, is enforced whenever the person making the payment stands in such relation to the premises or to the parties that his interest, recognized either at law or in equity, can only be fully protected and maintained by regarding the transactions as an assignment to him. The recognition by courts of equity of assignments invalid at law is based fundamentally upon principles of natural justice and essential fairness." 3 P.L.E. *Assignments* § 25 (1957). *Accord, Lietka v. Hambersky,* 167 Pa.Super. 304, 308, 74 A.2d 698 (1950).

■ As noted above, Cluett was obligated under the lease to make the roof water-tight. "Principles of natural justice and essential fairness" compel the recognition of an equitable assignment from SAIC to Cluett of SAIC's right to recover for the negligent injury to the roof. Thus, Cluett, as an equitable assignee, is a real party in interest to this action. *See* 6 C. Wright & A. Miller, Federal Practice and Procedure § 1545 (1971).[17]

---

**15.** In consideration for its release from contractual commitments under the lease, Cluett in 1978 paid into an escrow account $515,000 to be applied toward repair of the warehouse roof. This payment was made in recognition of contractual obligations that existed at the time this suit was instituted. Cluett enjoys a cause of action in its own right against the defendants for negligent repairs that brought the contractual commitments into operation and necessitated the $515,000 outlay.

**16.** SAIC as owner of the demised warehouse may also be a real party in interest to an action seeking the recovery of the cost of replacing a new roof. *See Allegheny Airlines, Inc. v. Unit-*

ed *States,* 504 F.2d 104, 112 (7th Cir. 1974), *cert. denied,* 421 U.S. 978, 95 S.Ct. 1979, 44 L.Ed.2d 470 (1975). It does not appear to be an indispensable party, however, and its joinder is therefore unnecessary. Furthermore, under the terms of the lease Cluett's and SAIC's interest in the warehouse would appear to be mutual and SAIC would therefore be bound by any judgment on the merits of Cluett's action. *See Estate of Flinn,* 479 Pa. 312, 322, 388 A.2d 672 (1978); *Central Pennsylvania Lumber Co. v. Carter,* 348 Pa. 429, 431–32, 35 A.2d 282 (1944).

**17.** While payment of $515,000 toward the cost of replacing the roof may subrogate Cluett to SAIC's right to recover such costs from third-

## ORDER

Now, this 31st day of January 1980, in accordance with the accompanying memorandum this day filed, it is hereby ordered that:

(1) Cluett's claims concerning the design and construction of the roof are dismissed as time-barred under Pa.Stat.Ann. tit. 12, § 31 (1953) (Purdon);

(2) Defendants motions for summary judgment are in all other respects denied; and

(3) Cluett's motions (a) for sanctions against defendant Long Service Co., Inc.; (b) to strike the brief of Long Service Co., Inc. and deem the summary judgment motion of Long Service Co., Inc. as withdrawn; and (c) to strike the affidavit of George A. Long, Sr., are denied.

party tort feasors, *see Continental Casualty Co. v. Haenn Ship Ceiling & Refitting Corp.*, 134 F.Supp. 602 (E.D.Pa.1955); *Mosier's Appeal*, 56 Pa. 76 (1867), I do not believe that this subrogation interest, which was created four years after the institution of this action, provides a basis for recognizing Cluett as a real party in interest. If SAIC alone is the real party in interest to this action, it could not be substituted for Cluett because diversity jurisdiction would then be destroyed. Since diversity is determined as of the commencement of the action I believe that Cluett's status as a real party in interest must also be determined as of that time.