**RESOLUTION TRUST CORPORATION,**
**Receiver for Horizon Financial, F.A.**

v.

**Peter J. FARMER, et al.**

v.

**Sandra K. CHITWOOD, et al.**

v.

**PARKER, JOHNSON, COOK**
**& DUNLEVIE, et al.**

Civ. A. No. 92–3310.

United States District Court,
E.D. Pennsylvania.

Sept. 16, 1994.

John T. Rogers, Mannino, Walsh & Griffith, P.C., Roberta D. Liebenberg, Mager, Liebenberg & White, Marguerite S. Walsh, Mary Kay Brown, Buchanan Ingersoll, P.C., W. Scott Magargee, Mager, Liebenberg and White, Philadelphia, PA, for Resolution Trust Corp., Receiver for Horizon Financial F.A.

Mark A. Nation, William J. Brennan, J. Shane Creamer, Dilworth, Paxson, Kalish & Kauffman, Philadelphia, PA, for Peter J. Farmer, Gregor F. Meyer.

Robert L. Hickok, Jeffery C. Hayes, Pepper, Hamilton & Scheetz, Philadelphia, PA, for J. Stanley Davis, Robert P. Johnson, Carl N. Wallnau, John J. McCarthy, Jr., M.D., Paul Bendik, Louis A. Tronzo.

Glenn C. Equi, Diana Andreacchio, Harvey, Pennington, Herting & Renneisen, Ltd., Philadelphia, PA, for Stuckert & Yates, a Professional Partnership, John P. Diefenderfer, John Kerrigan, Jr., Richard Danese, Jr., Steven Sailer.

Kean K. McDonald, Sally J. Garber, Jeffrey D. Hutton, Pamela Tobin, Maria B. Mazzeo, La Brum and Doak, Philadelphia, PA, for Sidney T. Yates, Don F. Marshall.

Carl Anthony Maio, Margolis, Edelstein, Scherlis, Sarowitz & Kraemer, Glenn C. Equi, Diana Andreacchio, Harvey, Pennington, Herting & Renneisen, Ltd., Philadelphia, PA, for William F. Schroeder.

Carl Anthony Maio, Robert D. MacMahon, Margolis, Edelstein, Scherlis, Sarowitz & Kraemer, Philadelphia, PA, Glenn C. Equi, Harvey, Pennington, Herting & Renneisen, Ltd., Kimberly A. Rushton, Margolis, Edelstein, Scherlis, Sarowitz & Kraemer, Philadelphia, PA, for Greg B. Emmons.

Robert E. Welsh, Jr., Robert E. Welsh, Jr., Atty., Philadelphia, PA, for Richard Reynaud.

Anthony Granato, Mattioni, Mattioni & Mattioni, Ltd., Philadelphia, PA, Thomas C. Jessee, Jessee & Jessee, Johnson City, TN, for third-party defendants Sandra K. Chitwood, Gene Artrip, Margaret Artrip, Robert Hatfield, Stewart Credit Cars, Inc., Coasters Unlimited, Inc., Southeast Auto, Property Financial Services, Inc.

Robert C. Heim, William R. Spade, Jr., Dechert, Price & Rhoads, Philadelphia, PA, H. Lamar Mixson, Bondurant, Mixson & Elmore, Jill A. Pryor, Bondurant, Mixson & Elmore, Atlanta, GA, for third-party defendants Hurt Richardson Garner Todd and Cadenhead, E. Lewis Hansen.

Robert W. Hayes, Cozen & O'Connor, Philadelphia, PA, for third-party defendants Parker, Johnson, Cook & Dunlevie, Robert F. Cook.

## MEMORANDUM

RENDELL, District Judge.

On May 25, 1990, the Office of Thrift Supervision of the Department of the Treasury ("OTS") closed Horizon Financial F.A. ("Horizon") and appointed the Resolution Trust Corporation ("RTC") as Horizon's receiver. In that capacity, on June 5, 1992, the RTC filed this action seeking damages against Horizon's former directors and officers [1] and its general counsel, the law firm of Stuckert and Yates and its partners (collectively, the "Attorney Defendants") [2]. In a Memorandum and Order dated June 8, 1993, Judge Giles

---

1. Horizon's former directors and officers are: Peter J. Farmer, a director and the Chief Executive Officer; Gregor F. Meyer, a director and Chairman of the Board; Richard W. Reynaud, Group Vice President of Lending; and directors J. Stanley Davis, Robert P. Johnson, Carl N. Wallnau, John J. McCarthy, Jr., Paul Bendik and Louis A. Tronzo.

2. The Attorney Defendants are the firm of Stuckert and Yates and individual partners Sidney T. Yates, Don F. Marshall, John P. Diefenderfer, Jr., John H. Kerrigan, Jr., Richard Danese, Jr., Steven Sailer, William F. Schroeder and Greg B. Emmons.

(to whom the case was then assigned) dismissed several of the RTC's claims. Consequently, what remains are causes of action for gross negligence against the directors and officers and tort claims of malpractice, breach of fiduciary duty and aiding and abetting against the Attorney Defendants.[3]

Now before me is a motion for summary judgment, based on the statute of limitations, filed on behalf of Peter J. Farmer and Gregor Meyer (the "Inside Director Defendants") and the Attorney Defendants (collectively the "IDA Defendants"). In addition to the parties' extensive briefing, I held a hearing on May 27, 1994 at which I heard both testimony and oral argument. For the reasons that follow, I will deny the IDA Defendants' motion for summary judgment.

### I. Factual Background

Horizon was a federally insured, federally chartered mutual savings and loan association subject to the regulation and oversight of the Federal Home Loan Bank Board ("FHLBB"). On October 21, 1982 the FHLBB required Horizon to enter into a consent resolution (the "Consent Resolution"), whereby the board of directors of Horizon agreed, among other things, to obtain the written approval of the Federal Savings and Loan Insurance Corporation ("FSLIC") before Horizon would enter into any significant transaction, and to resign from the board if requested by the FSLIC. Horizon's difficulties continued when, on February 18, 1986, the FHLBB required Horizon to enter into a supervisory agreement (the "Supervisory Agreement") which required, among other things, that Horizon limit its liability growth to an annualized rate not greater than fifty percent and exert its best efforts to bring an infusion of capital into the institution. Horizon operated pursuant to the terms of the Consent Resolution and the Supervisory Agreement until June 7, 1989, when the FHLBB determined that Horizon was insolvent and appointed the FSLIC as Horizon's conservator. On August 9, 1989, pursuant to FIRREA, Congress abolished the FSLIC, 12 U.S.C. § 1437(a)(1), and created the RTC to manage failed savings and loan institutions. 12 U.S.C. § 1441a(b)(1). Thus, on May 25, 1990, when the OTS closed Horizon, it appointed the RTC as receiver. In that capacity, the RTC acquired all rights, titles, powers and privileges of Horizon, including the right to bring this action. 12 U.S.C. § 1441a(b)(4) and 12 U.S.C. § 1821(d)(2)(A)(i).

The RTC alleges that each defendant in "their various capacities, made, authorized and permitted numerous imprudent loans and, by their wrongful acts and omissions, caused Horizon substantial damage and loss" (Amended Complaint ¶ 38). The RTC alleges that the director and officer defendants were grossly negligent in that, among other things, they: failed to institute adequate loan policies and procedures; failed to institute adequate internal controls over lending officers; failed to monitor adequately the activities of lending officers; failed to conduct proper credit analysis and investigation; failed to establish policies and procedures despite criticisms of federal regulators; violated federal statutes rules and regulations; failed adequately to monitor loans; and failed to become sufficiently familiar with the savings and loan industry in general (Amended Complaint ¶ 68(a)–(j)). As against the Attorney Defendants, the RTC alleges that they breached their duties to the bank in that, among other things, they: failed to properly document loans; failed to become adequately familiar with legal issues relating to the banking industry in general and Horizon's business in particular; failed adequately to supervise Stuckert and Yates attorneys who worked on Horizon matters; failed to advise Horizon that its lending policies and procedures were inadequate; failed to advise Horizon that its internal controls over lending officers were inadequate; failed to advise Horizon that its credit analysis and investigation were inadequate; and failed to advise Horizon that certain loan agreements did not adequately protect its rights (id. at ¶ 84(a)–(i)).

---

**3.** In an earlier opinion in this matter, Judge Giles held that the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") establishes gross negligence as the applicable standard of liability for officers and directors of insured depository institutions. *See Resolution Trust Corp. v. Farmer, et al.,* 823 F.Supp. 302, 307 (E.D.Pa.1993).

At the center of this maelstrom are two series of related loan transactions that occurred between June 1984 and July 1986. These loans involved investments outside of Horizon's traditional geographic and risk boundaries. The risk proved to be unwise and the loans went into default allegedly causing approximately $17 million in losses to Horizon (Amended Complaint ¶ 65).

### A. *The SBL Portfolio*

Beginning in June 1984 and continuing through January 1985, Horizon purchased automobile and second mortgage consumer loan portfolios from three lending institutions: Sentry Acceptance Corporation, Bankers Service Corporation and Landbank Equities (collectively the "SBL portfolio") (Amended Complaint ¶¶ 39–47; Horizon Commitment with Sentry Acceptance Corporation dated June 21, 1984, Exhibit 2 of Appendix to Defendants' Memorandum in Support of Defendants' Motion for Summary Judgment, hereinafter cited as "Defendants' Appendix"; Horizon Commitment with Bankers Service Corporation dated January 17, 1985, Defendants' Appendix Exhibit 5). Problems with the SBL portfolio surfaced almost immediately (*see* memorandum written by Michael Callahan, a Horizon loan officer, included as part of the FHLBB Report of Examination as of December 15, 1984 at p. A0035031–36, Defendants' Appendix Exhibit 4). In the cover letter to its Report of Examination as of December 15, 1984—sent to Horizon's board on June 13, 1985—the FHLBB expressed its concerns to Horizon's board regarding these loans:

> We express to the board our serious concern at the precarious financial condition of the institution, as evidenced by continuing losses and the low sustaining power of current net worth. The difficulties encountered in the purchase of automobile loans from Sentry Acceptance Corporation ... are also of concern, as the institution can little afford additional losses of any kind at this time.

(Defendants' Appendix Exhibit 4).

### B. *The Brokers South Transactions*

In the fall of 1985, Horizon began to sell the SBL portfolio to Brokers South, Inc.

("Brokers South"), with Horizon providing all of the financing (FHLBB Report of Examination dated February 21, 1989, p. 12, 13, attached as Exhibit "J" to Memorandum of Law of Plaintiff Resolution Trust Corporation in Opposition to Defendants' Motion for Summary Judgment, hereinafter cited as "Plaintiff's Memorandum"). Brokers South was an affiliation of used-car dealerships operated throughout the southern United States, marketing cars primarily to low-income individuals (Amended Complaint ¶ 50). On October 31, 1985, Horizon entered into the first of three credit facilities with Brokers South. The transaction consisted of Brokers South using a portion of the $4.3 million loan to make a partial acquisition of the SBL portfolio from Horizon, with the remainder to be used to finance Brokers South's operations (Loan Committee Minutes dated November 22, 1985, Defendants' Appendix Exhibit 10).

On December 6, 1985, Horizon closed its second credit facility to Brokers South (*see* Loan Committee Minutes dated December 13, 1985, Defendants' Appendix Exhibit 10). This loan was structured similar to the first and increased Brokers South's line of credit from $2 to $4 million (see Committee Action Work Sheet, dated December 9, 1985, Defendants' Appendix Exhibit 11). Again, Brokers South used a portion of the loan proceeds to acquire more of the SBL portfolio from Horizon. In early July 1986, Horizon made its third and final loan to Brokers South.

In September 1987, the Brokers South credit was restructured due to its difficulty in paying off its loans with Horizon (FHLBB Report of Examination, dated February 21, 1989, p. 12.13, Exhibit "J" to Plaintiff's Memorandum). Despite this restructuring Brokers South could still not meet its obligations. By January 1988 Brokers South was in default under the Restructuring Agreement (see *id.* at p. 12.14).

The RTC alleges that Horizon suffered approximately $17 million in losses in connection with the SBL portfolio and Brokers South loans (collectively, the "SBL/Brokers

South portfolio"). It is these losses that the RTC claims as damages.

In their motion for summary judgment, the IDA Defendants argue that the RTC's claims with respect to all of these underlying transactions are time barred. In response, the RTC contends that the statute of limitations had not run on its claims and, that even if I conclude it had, the doctrine of adverse domination applies and operates to toll the statute. The IDA Defendants adamantly contest this assertion. They argue that I should not adopt the doctrine of adverse domination because no Pennsylvania court has ever recognized it. Moreover, they argue that even assuming the Pennsylvania courts would adopt the doctrine of adverse domination it should not apply in this case because from the time of the 1982 Consent Resolution the FHLBB controlled Horizon. Finally, the Attorney Defendants assert that even if I toll the statute of limitations with respect to the claims against the Inside Director Defendants, I should not apply the doctrine of adverse domination to the claims against them. They reason that this doctrine should only be used to toll the statute of limitations with respect to directors and officers who control an institution.

## II. *Summary Judgment Standard*

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A factual dispute is "material" only if it might affect the outcome of the suit under governing law, *id.* at 248, 106 S.Ct. at 2510, and all inferences must be drawn, and all doubts resolved, in favor of the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 993, 8 L.Ed.2d 176 (1962); *Gans v. Mundy,* 762 F.2d 338,

341 (3d Cir.), *cert. denied,* 474 U.S. 1010, 106 S.Ct. 537, 88 L.Ed.2d 467 (1985).

On a motion for summary judgment, the moving party bears the initial burden of identifying for the Court those portions of the record that it believes demonstrate the absence of dispute as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). To defeat summary judgment, the non-moving party "may not rest upon the mere allegations or denials of [its] pleading, but [its] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). If that evidence is, however, " 'merely colorable' or is 'not significantly probative,' summary judgment may be granted." *Equimark Commercial Finance Co. v. C.I.T. Financial Services Corp.,* 812 F.2d 141, 144 (3d Cir.1987) (quoting, in part, *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11). The non-moving party must demonstrate the existence of evidence that would support a jury finding in its favor. *See Anderson,* 477 U.S. at 248–49, 106 S.Ct. at 2510–11.

Under Pennsylvania law, the burden is on the plaintiff to plead and prove facts which would serve to toll the statute of limitations. *Harper v. Superior Tool and Die Co.,* 1987 WL 18414 (E.D.Pa. Oct. 7, 1987). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue," the nonmoving party must go "beyond the pleadings" and produce summary judgment evidence designating " 'specific facts showing that there is a genuine issue for trial.' " *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553 (quoting Fed.R.Civ.P. 56(e)). Thus, the RTC bears the burden of producing some summary judgment evidence in support of its tolling argument. See *Federal Deposit Ins. Corp. v. Shrader & York,* 991 F.2d 216, 220 (5th Cir.1993).

## III. *Legal Analysis*

FIRREA provides a three-year federal statute of limitations for claims the RTC brings as receiver. 12 U.S.C. § 1821(d)(14).[4]

---

4. 12 U.S.C. § 1821(d)(14) provides in relevant part:

In interpreting this statute, however, courts have held that it does not revive stale state law claims that the RTC acquired. *Randolph v. Resolution Trust Corp.*, 995 F.2d 611, 619 (5th Cir.1993); *Fed. Deposit Ins. Corp. v. Regier Carr & Monroe*, 996 F.2d 222, 225–26 (10th Cir.1993); *Fed. Deposit Ins. Corp. v. McSweeney*, 976 F.2d 532, 534 (9th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 2440, 124 L.Ed.2d 658 (1993); *Cf. Fed. Deposit Ins. Corp. v. Hinkson*, 848 F.2d 432, 434 (3d Cir.1988) (applying the general federal limitations statute, 28 U.S.C. § 2415). Thus, I must undertake a two-step analysis to resolve the statute of limitations defense. First, I must determine whether the applicable Pennsylvania limitations period had expired before the FSLIC acquired the state law causes of action the RTC now asserts.[5] Second, if the state statute had not yet expired, I must determine whether the applicable three-year federal limitations period expired between the date the FSLIC acquired the causes of action and the date the RTC filed this suit. *See, e.g., Fed. Deposit Ins. Corp. v. Dawson*, 4 F.3d 1303, 1307 (5th Cir.1993).

In the present case, the second prong of this analysis (whether the FIRREA limitations period expired) is not in dispute. It is uncontroverted that the RTC filed its claims against the defendants in time to meet the three-year FIRREA statute of limitations. Thus, the only issue is whether the applicable state statute of limitations had expired before Horizon assigned its claims against the defendants to the FSLIC when it was placed in conservatorship on June 7, 1989. To answer this question I must traverse many issues which I will group under three general headings: (A) which Pennsylvania statute of limitations applies; (B) when did the cause of action accrue; and (C) should the limitations period be equitably tolled?

### A. Which Pennsylvania Statute of Limitations Applies?

The parties agree that the controlling statute of limitations is set forth in 42 Pa.Cons. Stat.Ann. § 5524, which provides, in pertinent part, that:

> The following actions and proceedings must be commenced within two years:
>
> \* \* \* \* \* \*
>
> (7) Any other action or proceeding to recover damages for injury to person or property which is founded on negligent, intentional, or otherwise tortious conduct . . .

### B. When Did the Cause of Action Accrue?

For tort actions, the general rule in Pennsylvania is that the statute begins to run when the cause of action arises, as determined by the occurrence of the final significant event necessary to make the claim sua-

---

(A) In general

Notwithstanding any provision of any contract, the applicable statute of limitations with regard to any action brought by [a federal entity] as conservator or receiver shall be—

\* \* \* \* \* \*

(ii) in the case of any tort claim, the longer of—
(I) the 3–year period beginning on the date the claim accrues; or
(II) the period applicable under State law.
(B) Determination of the date on which a claim accrues

For purposes of subparagraph (A), the date on which the statute of limitations begins to run on any claim described in such subparagraph shall be the later of—
(i) the date of the appointment of the [federal entity] as conservator or receiver; or
(ii) the date on which the cause of action accrues.

5. The IDA Defendants contend that May 25, 1990, the date when the RTC was appointed receiver, is the operative date for determining when the federal three-year statute of limitations began to run. The RTC argues, and I agree, that the correct date is June 7, 1989, the date when the FSLIC was appointed conservator. As conservator, FSLIC was granted the power

> [t]o take whatever actions are deemed appropriate, including the institution of litigation, if appropriate, to recover on claims of [Horizon] against current or former officers, directors and controlling persons of [Horizon], affiliated persons and third parties.

*See* Exhibit "A" to the Amended Complaint. When a federal entity becomes conservator of a financial institution, acquiring the assets of that institution, FIRREA provides that the entity will have three years from the date of conservatorship or accrual, whichever is later, in which to file suit on a tort claim. 12 U.S.C. § 1821(d)(14).

ble. *Mack Trucks, Inc. v. Bendix–Westinghouse Automotive Air Brake Co.,* 372 F.2d 18, 20 (3d Cir.1966) (citing *Foley v. Pittsburgh–Des Moines Co.,* 363 Pa. 1, 68 A.2d 517 (1949); *Bell v. Brady,* 346 Pa. 666, 31 A.2d 547 (1943); *In re Shaffer's Estate,* 228 Pa. 36, 76 A. 716 (1910)). The RTC argues that this did not happen until February 1989, when Horizon wrote off the losses as a result of the SBL/Brokers South portfolio thereby sustaining an injury. Thus, the RTC asserts that not until then did the statute of limitations begin to run, so that on June 7, 1989, when the FSLIC became conservator, its claims were still viable. I do not agree.

The RTC's argument fails because Horizon sustained a legally cognizable injury long before it chose to recognize the losses from the SBL/Brokers South portfolio. The gravamen of the RTC's claims against the IDA Defendants is their alleged tortious failure to ensure that proper written policies and procedures and internal controls were implemented before Horizon entered into the transactions, as well as their allowing the transactions to be made in violation of safe and sound banking practices. These acts, themselves, constitute legal injuries. *See Resolution Trust Corp. v. Seale,* 13 F.3d 850, 852–54 (5th Cir.1994); *Resolution Trust Corp. v. Acton,* 844 F.Supp. 307, 316–17 (N.D.Tex.1994); *Fed. Deposit Ins. Corp. v. Howse,* 736 F.Supp. 1437, 1440–41 (S.D.Tex. 1990). At the moment the money left the bank, Horizon suffered enough legal injury to trigger the running of the statute of limitations. *See Ebbert v. Plymouth Oil Co.,* 348 Pa. 129, 34 A.2d 493, 496 (1943) (limitations period begins to run at the time of the allegedly unlawful diversion of the company's funds); *Moore v. McComsey,* 313 Pa.Super. 264, 459 A.2d 841, 844 (1983) (in negligence actions, "[t]he general rule is that the statute begins to run from the time the negligent act is done"). *See also* 3A James Solheim & Kenneth Elkins, Fletcher Cyclopedia of the Law of Private Corporations § 1306 (1994), hereinafter cited as "Fletcher Cyclopedia" (statute of limitations begins to run on an action against directors of a corporation from the time of the alleged wrongful act or omission). Thus, the latest the RTC's cause of action against the Inside Director Defendants accrued was when Horizon made the last loan to Brokers South in July 1986.

Similarly, the RTC's causes of action against the Attorney Defendants accrued when they breached their professional duty of care and thereby harmed Horizon. *See Sherman Industries, Inc. v. Goldhammer,* 683 F.Supp. 502, 508 (E.D.Pa.1988) (citing *Trice v. Mozenter,* 356 Pa.Super. 510, 515 A.2d 10, 13 (1986)) ("[a] plaintiff has a claim of legal malpractice based on its lawyer's negligence as soon as the lawyer has breached his professional duty of care and has thereby harmed the client"). This, too, occurred, at the latest, on the date Horizon made the last loan to Brokers South.

To summarize, the latest the statute of limitations began to run on the SBL portfolio transactions was January 1985 and on the Brokers South transactions, July 1986. Thus, unless I apply some equitable doctrine to mitigate the result that the occurrence rule compels, the two-year limitations period expired before the FSLIC was appointed Horizon's conservator on June 7, 1989.

### C. *Should the Limitations Period be Equitably Tolled?*

#### 1. *State or Federal Law*

█ As a preliminary matter, I must decide if state or federal law governs whether the statute of limitations should be tolled. As I have stated, the parties agree that Pennsylvania's limitations period applies. That being the case, the Third Circuit has instructed that, generally, " 'state tolling principles are ... to be used by a federal court when it is applying a state limitations period.' " *Bohus v. Beloff,* 950 F.2d 919, 924 (3d Cir.1991) (quoting *Vernau v. Vic's Market, Inc.,* 896 F.2d 43, 45 (3d Cir.1990)). More specifically, in cases similar to this one, courts have held that the question of whether the state's statute of limitations was equitably tolled is a question of state law. *See Fed. Deposit Ins. Corp. v. Dawson,* 4 F.3d 1303, 1308–09 (5th Cir.1993); *Fed. Deposit Ins. Corp. v. Cocke,* 7 F.3d 396, 400 (4th Cir.1993). In arguing for the contrary result, the RTC primarily relies on *Farmers & Merchants Nat'l Bank v. Bryan,* 902 F.2d 1520, 1522

(10th Cir.1990). However, in *Dawson,* the Fifth Circuit articulated fundamental flaws with the reasoning of the Tenth Circuit in that opinion. *Dawson,* 4 F.3d at 1308–09.[6] I find that *Dawson* is persuasive and, accordingly, I disagree with the Tenth Circuit's holding on this issue.

More importantly, though, the Supreme Court's recent decision in *O'Melveny & Myers v. Fed. Deposit Ins. Corp.,* —— U.S. ——, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994), put to rest any doubts I may have harbored regarding this issue. As the Court stated, " 'There is no federal general common law,' *Erie R.R. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938), and ... the remote possibility that corporations may go into federal receivership is no conceivable basis for adopting a special federal common-law rule ..." *Id.* —— U.S. at ——, 114 S.Ct. at 2053. The Court went to hold that:

> § 1821(d)(2)(A)(i) [of FIRREA] places the [RTC] in the shoes of the insolvent S & L, to work out its claims under state law, except where some provision in the extensive framework of FIRREA provides otherwise. To create additional "federal common-law" exceptions is not to "supplement" this scheme, but to alter it.

*Id.* at ——, 114 S.Ct. at 2054. The RTC does not, nor can it, point to a provision of FIRREA which provides that courts should apply federal common law to determine whether the state statute of limitations was equitably tolled. Thus, if the RTC is to convince me that the statute of limitations should be tolled prior to the FSLIC's appointment as conservator, it must do so under Pennsylvania law.

### 2. *Adverse Domination—Generally*

■ Under the doctrine of adverse domination, the statute of limitations is tolled for as long as a corporate plaintiff is controlled by the alleged wrongdoers. *See* 3A Fletcher Cyclopedia § 1306.20. The doctrine is based on the theory that the corporation which can only act through the controlling wrongdoers cannot reasonably be expected to pursue a claim which it has against them until they are no longer in control. In this case, the RTC is bringing what is, and was, Horizon's causes of action against its former officers, directors and attorneys. No Pennsylvania state court has explicitly accepted or rejected this doctrine.[7] As I will discuss in more detail below, courts in other jurisdictions have begun increasingly to apply the adverse domination doctrine in cases involving causes of action of non-stock institutions against directors and officers. *See, e.g., Fed. Deposit Ins. Corp. v. Dawson,* 4 F.3d 1303 (5th Cir. 1993); *Farmers & Merchants Nat. Bank v. Bryan,* 902 F.2d 1520 (10th Cir.1990); *Int'l Ry. of Cent. Am. v. United Fruit Co.,* 373 F.2d 408 (2d Cir.), *cert. denied,* 387 U.S. 921, 87 S.Ct. 2031, 18 L.Ed.2d 975 (1967); *Resolution Trust Corp. v. O'Bear, Overholser,*

---

**6.** The weakness in the analysis put forward in *Bryan* stems from that court's misplaced reliance on the case of *Holmberg v. Armbrecht,* 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743 (1946), which set forth the principle that equitable tolling is governed by federal law even in cases where a state statute of limitations applies. *Dawson,* 4 F.3d at 1308. The "continued vitality of *Holmberg* and its progeny," the *Dawson* court observed, has been put into doubt in the wake of the Supreme Court's more recent decisions in *Board of Regents v. Tomanio,* 446 U.S. 478, 100 S.Ct. 1790, 64 L.Ed.2d 440 (1980), and *Johnson v. Railway Express Agency,* 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975). *Dawson,* 4 F.3d at 1309 (citing *Smith v. City of Chicago Heights,* 951 F.2d 834, 839 (7th Cir.1992)). The Supreme Court held in those cases that, when a federal court borrows a state statute of limitations, "state tolling principles are to be the 'primary guide' of the federal court," *Dawson,* 4 F.3d at 1309 (quoting *Johnson,* 421 U.S. at 463, 95 S.Ct. at 1722), and may be disregarded only where "inconsistent

with federal policy." *Dawson,* 4 F.3d at 1309 (citing *Tomanio,* 446 U.S. at 483–87, 100 S.Ct. at 1795–96).

**7.** Several federal courts in this district have noted in dicta that Pennsylvania recognizes the adverse domination doctrine. *See In re Lloyd Sec.,* 153 B.R. 677, 684 (E.D.Pa.1993); *In re Lloyd Sec.,* 1992 WL 119362 at *10 (Bankr.E.D.Pa. May 21, 1992); *In re Numedco, Inc.,* 1991 WL 204908 at *4 (Bankr.E.D.Pa. Oct. 7, 1991); *Harper v. Superior Tool and Die Co.,* 1987 WL 18414 at *3 (E.D.Pa. Oct. 7, 1987). However, only one decision of a Pennsylvania court, *Lutherland, Inc. v. Dahlen,* 357 Pa. 143, 53 A.2d 143 (1947), is cited as support for this proposition. Having read *Lutherland,* paying particular attention to the language the RTC has cited, I conclude that, while its reasoning is instructive, it does not announce acceptance of the adverse domination doctrine as such in Pennsylvania.

**1152**

*Smith & Huffer,* 840 F.Supp. 1270 (N.D.Ind. 1993); *Fed. Deposit Ins. Corp. v. Gonzalez–Gorrondona,* 833 F.Supp. 1545 (S.D.Fla. 1993); *Resolution Trust Corp. v. Kerr,* 804 F.Supp. 1091 (W.D.Ark.1992); *Resolution Trust Corp. v. Gallagher,* 800 F.Supp. 595 (N.D.Ill.1992); *Resolution Trust Corp. v. Gardner,* 798 F.Supp. 790 (D.D.C.1992); *Fed. Deposit Ins. Corp. v. Howse,* 736 F.Supp. 1437 (S.D.Tex.1990); *Fed. Deposit Ins. Corp. v. Carlson,* 698 F.Supp. 178 (D.Minn.1988); *Fed. Deposit Ins. Corp. v. Hudson,* 673 F.Supp. 1039 (D.Kan.1987); *Fed. Sav. and Loan Ins. Corp. v. Williams,* 599 F.Supp. 1184 (D.Md.1984); *Fed. Deposit Ins. Corp. v. Bird,* 516 F.Supp. 647 (D.P.R.1981); *Saylor v. Lindsley,* 302 F.Supp. 1174 (S.D.N.Y. 1969); *Hecht v. Resolution Trust Corp.,* 333 Md. 324, 635 A.2d 394 (1994). I have reviewed these decisions and, while they may provide guidance, my task is to divine how the Pennsylvania courts would approach and resolve this issue. As Justice Stevens noted in his recent concurring opinion in *O'Melveny & Myers,* I must "estimate how the relevant state courts would perform their lawmaking task, and then emulate that sometimes purely hypothetical model." *O'Melveny & Myers,* —— U.S. at ——, 114 S.Ct. at 2056 (Stevens, J., concurring).

My challenge, therefore, is to determine whether the Pennsylvania Supreme Court would apply the doctrine of adverse domination in this case, *see Bohus v. Beloff,* 950 F.2d 919, 924 (3d Cir.1991) (citing *Commissioner v. Estate of Bosch,* 387 U.S. 456, 464–65, 87 S.Ct. 1776, 1782–82, 18 L.Ed.2d 886 (1967)), and, if so, how it would be applied, *i.e.,* what degree of domination and level of culpability are necessary to trigger the doctrine? I may look to the decisions of the Pennsylvania Superior Court which, "while not controlling, are 'indicia of how the [Pennsylvania Supreme Court] might decide' the issue." *McNasby v. Crown Cork & Seal Co.,* 888 F.2d 270, 281 (3d Cir.1989), *cert. denied,* 494 U.S. 1066, 110 S.Ct. 1783, 108 L.Ed.2d 784 (1990) (quoting *McGowan v. University of Scranton,* 759 F.2d 287, 291 (3d Cir.1985)). Thus, "relevant state precedents must be scrutinized with an eye toward the broad policies that informed those adjudications, and to the doctrinal trends which they evince." *McKenna v. Ortho Pharmaceutical Corp.,* 622 F.2d 657, 662 (3d Cir.1980).

### 3. *Pennsylvania's Tolling Principles*

 Statutes of limitations reflect the legislature's judgment of what is an adequate time for a diligent plaintiff to bring an action. *Ulakovic v. Metropolitan Life Ins. Co.,* 339 Pa. 571, 16 A.2d 41, 43 (1940). Several sometimes competing policies underlie statutes of limitations. One policy that underlies statutes of limitations expresses the desire to ensure fairness to defendants by discouraging long delays which may lead to disappearance of witnesses, loss of evidence and dimming of memories. *Id.* 16 A.2d at 42–43; *Schmucker v. Naugle,* 426 Pa. 203, 231 A.2d 121, 123 (1967). This policy of repose exists not only for the protection of the particular defendant, "it also has a public dimension; thus it has been said that it is 'a great public evil that estates should be forever in jeopardy and that no end should be put to stale controversies.'" *Anthony v. Koppers Co.,* 284 Pa.Super. 81, 425 A.2d 428, 441 (1980), *rev'd on other grounds,* 496 Pa. 119, 436 A.2d 181 (1981) (quoting *Kenyon v. Stewart,* 44 Pa. 179, 191 (1863)). Statutes of limitations also serve a punitive function. As the Pennsylvania Supreme Court has stated "[t]hey stimulate to activity and punish negligence." *Schmucker,* 426 Pa. 203, 231 A.2d at 123. A third policy is grounded in judicial economy: "it is awkward and wasteful for judicial resources to be used to decide stale claims on stale evidence." *Anthony,* 284 Pa.Super. 81, 425 A.2d at 441.

 These policies are reflected in Pennsylvania's general rule that a person asserting a cause of action against another has a duty to use all reasonable diligence to inform himself of the facts and to institute the suit within the prescribed limitations period. *Schaffer v. Larzelere,* 410 Pa. 402, 189 A.2d 267, 269 (1963). Mere mistake, misunderstanding or lack of knowledge is insufficient to toll the running of the statute. *Id.*

Courts applying Pennsylvania law are reluctant to engraft equitable exceptions onto statutes of limitations. *See, e.g. Baily v. Lewis,* 763 F.Supp. 802 (E.D.Pa.1991) (court

unwilling to apply discovery rule in case of sexual abuse where the plaintiff alleged he had repressed the memories of abuse); *E.J.M. v. Archdiocese of Phila.*, 424 Pa.Super. 449, 622 A.2d 1388, 1393 (1993) (court unwilling to apply discovery rule in case of sexual abuse where the plaintiff claimed he did not know the acts being done to him were "abuse"); *Kaskie v. Wright*, 403 Pa.Super. 334, 589 A.2d 213 (1991) (doctrine of fraudulent concealment did not toll statute of limitations in case of death of plaintiffs' minor child where they alleged that the defendant hospital concealed alcoholism and non-licensure of operating physician); *Pastierik v. Duquesne Light Co.*, 514 Pa. 517, 526 A.2d 323 (1987) (discovery rule is inapplicable in wrongful death and survival actions); *Walters v. Ditzler*, 424 Pa. 445, 450, 227 A.2d 833, 835 (1967) (statute of limitations will run against persons under a disability, including minors and incompetents). It appears to be the strong policy of Pennsylvania courts to favor the strict application of statutes of limitations. *E.J.M. v. Archdiocese of Philadelphia*, 424 Pa.Super. 449, 622 A.2d at 1393; *Henry v. Control Products Co.*, 284 Pa.Super. 417, 426 A.2d 116, 118 (1981). Nonetheless, Pennsylvania courts have recognized that in certain circumstances it is unduly harsh to bar a plaintiff's suit merely because of the passage of time. *Cathcart v. Keene Industrial Insulation*, 324 Pa.Super. 123, 471 A.2d 493, 500 (1984). In response to this concern the courts have crafted equitable doctrines, most notably the discovery rule and the concept of tolling if there has been fraudulent concealment by the defendant. At the heart of both doctrines is the question whether the plaintiff knew or using reasonable diligence should have known of the claim. *Vernau v. Vic's Market, Inc.*, 896 F.2d 43, 46 (3d Cir.1990) (quoting *Urland v. Merrell–Dow Pharmaceuticals, Inc.*, 822 F.2d 1268, 1273 (3d Cir.1987)). As the Pennsylvania Superior Court has explained:

> where knowledge is impossible because of the laws of nature, or because of the actual fraud or concealment of the wrongdoer, or where it is impractical to impose on one

who has been wronged the duty to explore and ferret out the undetectable act of the wrongdoer, the statute should begin to run from the time discovery of the injury is made. The law does not intend to bring about an unreasonable result.

*Med–Mar, Inc. v. Dilworth*, 214 Pa.Super. 402, 257 A.2d 910, 913 (1969). The principles of adverse domination necessarily flow from the reasoning underlying these two concepts.

In the case of *Lutherland, Inc. v. Dahlen*, 357 Pa. 143, 53 A.2d 143 (1947), the Supreme Court of Pennsylvania was faced with a factual situation somewhat analogous to the matter at hand, namely alleged wrongdoing by a dominant officer, and held that concealment by the officer would operate to toll the statute. 53 A.2d at 149–50. In so holding, the court indicated its reluctance to impose a duty of discovery on those being dominated by this individual, so that the statute would not be a bar to the corporation's suit.[8] *Id.* I will use this pronouncement as the starting point, that is, as the view in Pennsylvania that these two concepts should be applied by Pennsylvania courts to toll the statute. However, the precise parameters of adverse domination as it would be applied in Pennsylvania, and to the specific facts of this situation, must be explored further in making a ruling in this case.

#### a. Fraudulent Concealment

█ The doctrine of fraudulent concealment is based on estoppel principles and when applicable it prevents the defendant from asserting the statute of limitations as a defense, *see e.g. Schaffer*, 410 Pa. 402, 189 A.2d at 269; *Molineux v. Reed*, 516 Pa. 398, 532 A.2d 792, 794 (1987); *Kaskie*, 403 Pa.Super. 334, 589 A.2d 213; *DeMartino v. Albert Einstein Medical Center, Northern Division*, 313 Pa.Super. 492, 460 A.2d 295, 300–01 (1983); *Doner v. Jowitt and Rodgers Co.*, 299 Pa.Super. 492, 445 A.2d 1237, 1239 (1982). The Pennsylvania Supreme Court has described the doctrine of fraudulent concealment as follows:

---

**8.** *Lutherland, Inc.* involved a dominant president of a stock company where facts were concealed, and there was knowledge by dissident shareholders which "did not ripen into conviction" until further investigation by counsel. 53 A.2d at 150.

Where, "through fraud or concealment, the defendant causes the plaintiff to relax his vigilance or deviate from his right of inquiry," the defendant is estopped from invoking the bar of the statute of limitations. *Schaffer v. Larzelere*, 410 Pa. 402, 405, 189 A.2d 267, 269 (1963). Moreover, defendant's conduct need not rise to fraud or concealment in the strictest sense, that is, with an intent to deceive; unintentional fraud or concealment is sufficient. *Walters v. Ditzler*, 424 Pa. 445, 227 A.2d 833 (1967); *Nesbitt v. Erie Coach Company*, 416 Pa. 89, 204 A.2d 473 (1964). Mere mistake, misunderstanding or lack of knowledge is insufficient however, *Schaffer v. Larzelere*, supra . . .

*Molineux*, 516 Pa. 398, 532 A.2d at 794.

Relying on this doctrine, the IDA Defendants urge me to conclude that to toll the statute of limitations in Pennsylvania, the RTC must allege that there has been some act of concealment or fraud.[9] This, they argue, it has not done and, thus, the time for bringing its causes of action has expired.[10] I reject the IDA Defendants' invitation to confine my analysis under the rubric of fraudulent concealment. As the Court of Appeals of Maryland has observed:

It is not only in situations involving fraud that a corporation can be prevented from learning of a potential claim against its directors and officers. It is unlikely that directors will take the affirmative step of communicating information that could raise criticism of their performance. It is the fact of their control over information, not necessarily any fraudulent activity, that makes the [adverse domination] doctrine necessary.

*Hecht v. Resolution Trust Corp.*, 333 Md. 324, 635 A.2d 394, 408 (1994).

I believe that the principles of adverse domination are more logically aligned with the discovery rule than with fraudulent concealment.[11] I find this to be a sound approach because it focuses on the plaintiff's knowledge and ability to act. Discovery can usually be equated with ability to bring suit; if a corporation is dominated by the potential defendants, the ability to bring suit as a practical matter, only occurs after the domination ceases. Thus, I will focus my inquiry of whether the adverse domination doctrine should be applied in this case within the contours of the discovery rule. This does not mean, however, that I will completely disregard the underlying principles of fraudulent concealment, namely, that the culpability of the defendant is a relevant factor to consider when deciding whether to toll the statute of limitations.

### b. *The Discovery Rule*

The discovery rule is applied to delay

9. In support of this proposition the IDA Defendants cite cases such as *Doner v. Jowitt and Rodgers Co.*, 299 Pa.Super. 492, 445 A.2d 1237 (1982), which state that, "a defendant will be estopped from invoking the statute of limitations only in clear cases of fraud, deception or concealment." *Id.* 445 A.2d at 1239. These cases are explained in that each limits its holding to situations where the defendant is being equitably estopped from relying on the statute of limitations defense. Application of the discovery rule, however, does not estop a defendant from invoking this defense; rather it delays the running of the statute of limitations.

10. The doctrine of fraudulent concealment tolls the statute of limitations when the act of fraud or concealment causes the plaintiff to "relax his vigilance or deviate from his right of inquiry." *Med–Mar*, 214 Pa.Super. 402, 257 A.2d at 913. An issue arose during the May 27 hearing regarding whether Horizon's board of directors concealed the alleged wrongdoing of one of its lending officers from the bank examiners. As-

suming arguendo that it did, this act was immaterial to the time when the RTC brought suit. As the Superior Court of Pennsylvania has stated, "mere lack of information is not sufficient to make out a case for fraudulent concealment, the line between bare information and material facts must be drawn where the missing data is directly germane to the delay in advancing the claim." *Kaskie*, 403 Pa.Super. 334, 589 A.2d at 216.

11. In *In re Lloyd Sec.*, 153 B.R. 677, 685 (E.D.Pa. 1993), the court concluded that the adverse domination doctrine is merely a corollary of Pennsylvania's discovery rule, applied in the corporate context. *Accord RTC v. O'Bear, Overholser, Smith & Huffer*, 840 F.Supp. 1270, 1284 (N.D.Ind.1993) (Indiana's discovery rule (which is analogous to Pennsylvania's) is a corollary of adverse domination doctrine); *Fed. Deposit Ins. Corp. v. Gonzalez–Gorrondona*, 833 F.Supp. 1545, 1557 (S.D.Fla.1993) (Florida's discovery rule (which is analogous to Pennsylvania's) is a corollary of adverse domination doctrine).

the running of the statute of limitations.[12] *See, e.g., Molineux,* 516 Pa. 398, 532 A.2d at 794; *Schaffer,* 410 Pa. 402, 189 A.2d at 270; *Cathcart,* 324 Pa.Super. 123, 471 A.2d at 500; *Moore v. McComsey,* 313 Pa.Super. 264, 459 A.2d 841, 845 (1983). It "arises from the inability of the injured, despite the exercise of due diligence, to know of the injury or its cause." *Pocono International Raceway, Inc. v. Pocono Produce, Inc.,* 503 Pa. 80, 468 A.2d 468, 471 (1983). "Its purpose is to exclude the period of time during which the injured party is reasonably unaware that an injury has been sustained so that people in that class have essentially the same rights as those who suffer an immediately ascertainable injury." *Hayward v. Medical Center of Beaver County,* 530 Pa. 320, 608 A.2d 1040, 1042–43 (1992). Under the discovery rule, the statute of limitations begins to run when "the plaintiff knows, or reasonably should know: (1) that he has been injured, and (2) that his injury has been caused by another party's conduct." *Cathcart,* 324 Pa.Super. 123, 471 A.2d at 500 (footnote omitted).

The discovery rule was first applied in cases involving hidden underground injuries. *See Smith v. Bell Telephone Co.,* 397 Pa. 134, 153 A.2d 477 (1959) (underground telephone line conduit crushed and blocked sewage pipe); *Lewey v. H.C. Frick Coke Co.,* 166 Pa. 536, 31 A. 261 (1895) (mining of coal under plaintiff's land from access located on defendant's land). The rule's application was then expanded to include cases involving medical malpractice where the injury was not immediately apparent, *see Ayers v. Morgan,* 397 Pa. 282, 154 A.2d 788 (1959) (surgical sponge left in abdomen during operation performed nine years earlier); cases of "creeping diseases" where the plaintiff has been exposed to hazardous substances but is asymptomatic beyond the limitations period, *see Trieschock*

*v. Owens Corning Fiberglas Co.,* 354 Pa.Super. 263, 511 A.2d 863 (1986), *alloc. denied,* 514 Pa. 617, 521 A.2d 932 (1987) (asbestosis from exposure to asbestos); *Cathcart,* 324 Pa.Super. 123, 471 A.2d 493 (same); and breach of contract cases involving latent defects in construction, *see A.J. Aberman, Inc. v. Funk Building Corp.,* 278 Pa.Super. 385, 420 A.2d 594 (1980) (defective roof installed in construction of shopping center).

It is the " 'inherently unknowable' " character of the injury that is the critical factor that governs the applicability of the discovery rule. *See O'Brien v. Eli Lilly & Co.,* 668 F.2d 704, 705–06 (3d Cir.1981) (citations omitted). Once the plaintiff has notice of the existence of a cause of action the statute of limitations begins to run. Likewise, the doctrine of adverse domination presumes that while the wrongdoers possess knowledge of the claim, the potential corporate plaintiff, here Horizon, does not have meaningful knowledge with the ability to act on that knowledge until the wrongdoing directors and officers no longer control it.

Under Pennsylvania law, the central question in determining whether to toll a statute of limitations is whether the plaintiff knew or using reasonable diligence should have known of the claim. *Vernau,* 896 F.2d at 46 (quoting *Urland v. Merrell–Dow Pharmaceuticals, Inc.,* 822 F.2d 1268, 1273 (3d Cir.1987)). Thus, "knowledge" is the key to Pennsylvania's willingness to toll a statute of limitations. A corporate plaintiff does not have "knowledge" of an injury to itself until those individuals who control it know of the injury and are willing to act on that knowledge. This idea is consistent with Pennsylvania agency law, which provides that knowledge of an agent whose interests are adverse to the principal cannot be imputed to the

---

12. The Pennsylvania Supreme Court has made an important distinction between statutes of limitations that are triggered by specific events, such as death, and statutes that are triggered by ambiguous terms, such as "injury". The latter, the Court has reasoned, provide room for application of the judicially created discovery rule, while the former do not. As the Pennsylvania Supreme Court reiterated in *Pastierik:*

"Statutory references to the occurrence of an 'injury' or the accrual of a 'cause of action' are

subject to judicial interpretation as to the degree of knowledge a plaintiff must possess before the statute will start to run. In contrast, the requirement that a wrongful death action be brought within [a specified number of years] after a definitely established event,— 'death'—leaves no room for construction."

514 Pa. 517, 526 A.2d at 325 (quoting *Anthony v. Koppers Co.,* 496 Pa. 119, 436 A.2d 181, 184 (1981)).

principal. *Bailey v. Jacobs,* 325 Pa. 187, 189 A. 320, 328 (1937). It would be unreasonable not to interpret the concept of knowledge to encompass both cognizance of an injury and the willingness and practical ability to act on that knowledge. As Justice McBride of the Pennsylvania Supreme Court stated in his concurring opinion in *Ayers v. Morgan:*

> [T]he restrictions imposed [by a statute of limitations] may not be so arbitrary as to preclude a reasonable opportunity for one who has been harmed to make his claim.

397 Pa. 282, 154 A.2d 788, 794–95 (1959). The "one", in this case, is Horizon. It did not have a reasonable opportunity to make its claim until June 7, 1989, the date on which the FSLIC was appointed conservator and took control from the board. Based on these settled principles, I find that the Pennsylvania Supreme Court would determine that the concept of adverse domination should be recognized and applied in this case.

### 4. Pennsylvania Law of Adverse Domination

With the precepts I discussed earlier still in mind, I now must stake out the boundaries of the adverse domination doctrine as Pennsylvania courts would envision it. As stated previously, generally speaking, the adverse domination doctrine tolls the statute of limitations for as long as a corporate plaintiff is controlled by the wrongdoers. Two variables affect the scope of this doctrine: the number of wrongdoers necessary to establish "domination", and the level of culpability necessary to consider a corporate officer or director a "wrongdoer". I will discuss each in turn.

Courts adopting the concept of adverse domination have developed two theories with respect to the showing a plaintiff must make to establish that the wrongdoers "dominated" the corporation. The more common "majority test" requires the plaintiff to show that a majority of the board members were wrongdoers during the period the plaintiff seeks to toll the statute of limitations. *See e.g. Fed. Deposit Ins. Corp. v. Dawson,* 4 F.3d 1303, 1310 (5th Cir.1993); *Fed. Deposit Ins. Corp.*

*v. Howse,* 736 F.Supp. 1437, 1441 (S.D.Tex. 1990); *Fed. Sav. and Loan Ins. Corp. v. Williams,* 599 F.Supp. 1184, 1195 (D.Md. 1984); *Fed. Deposit Ins. Corp. v. Bird,* 516 F.Supp. 647, 651 (D.P.R.1981). This standard is premised on the notion that "the mere existence of a culpable majority on the board is so likely to preclude the corporation from filing suit against the wrongdoers that tolling is thereby justified." *Dawson,* 4 F.3d at 1310 (citing *Williams,* 599 F.Supp. at 1194). Courts have given two rationales to justify this assumption. First, that a culpable majority can control the flow of information thereby preventing disclosure of incriminating information. *See Williams,* 599 F.Supp. at 1193–94 n. 12.; *Dawson,* 4 F.3d at 1313. Second, that it is unreasonable to expect the culpable directors to bring suit against themselves and that as a practical matter only when a majority of the board no longer consists of wrongdoers can an action be initiated. *See, e.g., Howse,* 736 F.Supp. at 1441.

Other courts have adopted the more stringent "complete domination" test, which requires the plaintiff to show "full, complete and exclusive control in the directors or officers charged" with the wrongdoing. *Farmers & Merchants National Bank v. Bryan,* 902 F.2d 1520, 1522 (10th Cir.1990) (quoting *Int'l Rys. of Cent. Am. v. United Fruit Co.,* 373 F.2d 408, 414 (2d Cir.), *cert. denied,* 387 U.S. 921, 87 S.Ct. 2031, 18 L.Ed.2d 975 (1967)); *see also Mosesian v. Peat, Marwick, Mitchell & Co.,* 727 F.2d 873, 879 (9th Cir.), *cert. denied,* 469 U.S. 932, 105 S.Ct. 329, 83 L.Ed.2d 265 (1984); *Resolution Trust Corp. v. Hecht,* 833 F.Supp. 529, 533 (D.Md.1993); [13] *Resolution Trust Corp. v. Fleischer,* 826 F.Supp. 1273, 1276 (D.Kan.1993). Thus, the plaintiff must negate the possibility that an informed shareholder or director could have induced the corporation to initiate suit. *Bryan,* 902 F.2d at 1522.; *Int'l Rys.,* 373 F.2d at 414.

Turning to the second variable in the adverse domination equation, three theories have emerged regarding the level of culpabil-

---

**13.** The Court of Appeals of Maryland recently rejected the "complete domination" test. *Hecht* *v. RTC,* 333 Md. 324, 635 A.2d 394 (1994).

ity necessary to make a corporate officer or director a "wrongdoer". The most plaintiff-friendly theory holds that negligent conduct, without more, is sufficient to warrant application of the adverse domination doctrine. *Fed. Deposit Ins. Corp. v. Carlson,* 698 F.Supp. 178, 180 (D.Minn.1988). More recently, however, courts have held that negligent conduct is not enough to support the presumptions that underlie the adverse domination doctrine. *Dawson,* 4 F.3d at 1313. While these courts do not specifically define what level of culpability is enough, they reason that negligence is insufficient because

> it could almost always be said that when one or two directors actively injure the corporation ... the remaining directors are at least negligent for failing to exercise 'every precaution or investigation.' If adverse domination theory is not to overthrow the statute of limitations completely in the corporate context, it must be limited to those cases in which the culpable directors have been active participants in wrongdoing or fraud, rather than simply negligent.

*Dawson,* 4 F.3d at 1312 (citation omitted). *See also Fed. Deposit Ins. Corp. v. Fay,* 1994 Buraff's Litigation Reports, Vol. 2, No. 19, 1993 WL 740984 (S.D.Tex. Dec. 21, 1993). Finally, at least one court has held that, viewing the concept of adverse domination as a type of equitable estoppel, a Virginia court would require a plaintiff to show that the directors concealed their wrongdoing. *Fed. Deposit Ins. Corp. v. Cocke,* 7 F.3d 396, 402–03 (4th Cir.1993).

With this as my palette, I turn to the question of which variation of the adverse domination doctrine is most consistent with the Pennsylvania tolling principles discussed above. Foremost in my mind is that Pennsylvania's tolling principles are "founded

upon simple notions of equity and fairness." *Bowman v. Abramson,* 545 F.Supp. 227, 231 (E.D.Pa.1982). A statute of limitations should only be tolled "to prevent an injustice, never to start the statute to create one." *Id.* Moreover, in Pennsylvania the burden is on the plaintiff to plead and prove facts which would serve to toll the statute of limitations. *Johns v. Estate of Cheeseman,* 457 Pa. 414, 322 A.2d 648, 651 (1974).

I also recognize that certain policies and interests are at issue, and at odds, in this analysis. There is a public interest in maximizing the amount of money the RTC may recover from those it alleges are responsible for the failure of a bank; however, this interest can not be extolled to the point of eclipsing all others. *See O'Melveny & Myers,* —— U.S. at ——, 114 S.Ct. at 2055. Also, as discussed above, there is a public interest in strictly construing statutes of limitations, not to mention each of the individual IDA Defendant's interests in that policy. Thus, I must strike a balance, taking into account these as well as many other legitimate competing interests.

■ I predict that the Pennsylvania Supreme Court would strike that balance with a version of the adverse domination doctrine that incorporates the "complete domination" test with the requirement that each wrongdoer's conduct goes beyond mere negligence. I believe such a formulation places the adverse domination doctrine in accord with the essence of Pennsylvania's discovery rule. Thus the plaintiff must negate the possibility that an informed person or persons could have induced the corporation to initiate suit.[14] At the same time, plaintiff must show that those in such position were active participants in true wrongdoing, that is, their conduct was more culpable than mere negligence.[15] Under this concept, the statute will

---

**14.** This will require case by case analysis. In many instances this may result in a showing that an entity could act only pursuant to a formal decision by no less than a majority of the board, but does permit a broader range of possibilities if, for instance, an institution was dominated by one or more individuals, or had an executive or other committee which, in each instance, could have acted to cause a claim to be made and pursued but consisted of less in number than a board majority. Or, as in *Lutherland, Inc.,* the

presence of a truly dominant officer, who actually controlled all affairs, could negate the possibility of action by others. *See Lutherland, Inc.,* 357 Pa. 143, 53 A.2d 143.

**15.** This requirement of culpability—even under a majority domination requirement—leaves open the possibility that if a majority of the board (or the entire board, for that matter) that committed the alleged wrongdoing was guilty of mere negligence, that showing alone, without any change of

be tolled if there was no informed but not culpable [16] person who was in a position to commence or cause the commencement of a lawsuit, and would continue to be tolled until such time as there was such a person (acting alone or with others), at which time the statute would begin to run.

In the context of this case, therefore, the RTC has the burden of showing that such an informed, empowered, but not culpable person or persons, did not exist from the time the statute of limitations began to run—at the latest January 1985 for the SBL portfolio transactions and July 1986 for the Brokers South transactions—until June 7, 1987, two years before the FSLIC was appointed Horizon's conservator. This places "a heavy burden of inquiry" where it should be, on the party seeking to toll the statute of limitations. *See Lowe v. Johns–Manville Corp.*, 604 F.Supp. 1123, 1127 (E.D.Pa.1985).

### 5. *Is Adverse Domination Broad Enough to Apply to the Attorney Defendants?*

 The Attorney Defendants argue that even if I apply the adverse domination doctrine to toll the statute of limitations as to the claims against the Inside Director Defendants, I should follow the Fifth Circuit's reasoning in *Fed. Deposit Ins. Corp. v. Shrader & York*, 991 F.2d 216 (5th Cir.1993), and hold that the doctrine is not broad enough to encompass the RTC's claims against them. I decline to do so, and find the court's reasoning in *Resolution Trust Corp. v. Gardner*, 798 F.Supp. 790, 795–96 (D.D.C.1992), more persuasive and consistent with applying the adverse domination doctrine to the Insider Director Defendants. *See also Mosesian v. Peat, Marwick, Mitchell & Co.*, 727 F.2d at 879 (adverse domination applied to accountant); *In re American Continental Corp./Lincoln S & L Sec. Lit.*, 794 F.Supp. 1424, 1453 (D.Ariz.1992) (adverse domination applied to outside law firm). In short, the Inside Director Defendants were not in a position to cause Horizon to sue the Attorney

Defendants without possibly exposing their own alleged wrongdoing. Thus, if the facts persuade a jury that the statute of limitations should be tolled with respect to the Inside Director Defendants, then it should be tolled as to the Attorney Defendants as well. I view the fact that none of the Attorney Defendants were on Horizon's board or that their culpability may not have risen above negligence as immaterial to determining whether the limitations period should be tolled as to the claims against them.

### 6. *Application of Pennsylvania's Adverse Domination Doctrine to the Facts of This Case*

 In Pennsylvania, whether the statute of limitations has run is usually a question of law for the judge, but where the issue involves a factual determination, that determination is for the jury. *Hayward v. Medical Center of Beaver County*, 530 Pa. 320, 608 A.2d 1040, 1043 (1992) (citing *Smith v. Bell Telephone Co. of Pennsylvania*, 397 Pa. 134, 142, 153 A.2d 477, 481 (1959)). In this case, genuine issues of material fact exist which preclude me from granting the IDA Defendants' motion for summary judgment. For example, on the record before me I cannot determine as a matter of law whether anyone qualifies as an informed, empowered, but not culpable person as described above.

I can conclude, however, that as a matter of law the 1982 Consent Resolution, the 1986 Supervisory Agreement and the fact that the FHLBB conducted five periodic examinations of Horizon do not qualify the RTC, or any other regulatory body, as such a person. Virtually every court that has addressed this issue, in whatever guise the defendants raised it, has held that the fact that a regulatory body—even the eventual plaintiff—acquired knowledge of the wrong and possessed certain power over the institution, including the ability to request director resignations, does not negate the adverse domination doctrine or constitute, standing alone, the necessary cessation of domination so that

---

domination, or proof that less could have acted to influence them, would result in the inapplicability of the tolling permitted under the adverse domination theory.

**16.** For this purpose, I am using the concept of "culpable" as meaning more than negligent, so that a "not culpable" officer or director would be one who was either not involved in the wrongdoing at all or, if involved, was merely negligent.

it could or should have brought a lawsuit. *See Resolution Trust Corp. v. Hecht,* 833 F.Supp. 529, 533 (D.Md.1993); *Resolution Trust Corp. v. Fleischer,* 826 F.Supp. 1273, 1277–78 (D.Kan.1993); *Fed. Deposit Ins. Corp. v. Howse,* 736 F.Supp. at 1442; *Fed. Deposit Ins. Corp. v. Buttram,* 590 F.Supp. 251, 254 (N.D.Ala.1984); *But see Resolution Trust Corp. v. Kerr,* 804 F.Supp. 1091, 1096 (W.D.Ark.1992) (record before the court was insufficient to conclude that as a matter of law the defendants' control or domination of the bank ended when consent agreement was entered).

## IV. *Conclusion*

I have struck what I consider is a fair balance between the competing interests represented in this case. On the one hand, the law should not permit culpable directors to benefit from their failure to pursue a claim on behalf of the corporation. On the other, "[a]fter a certain period of time a wrongdoer should have repose and be spared the inconvenience and prejudice that may result from attempting to defend himself against a stale claim." *DeMartino v. Albert Einstein Medical Center, Northern Division,* 313 Pa.Super. 492, 460 A.2d 295, 303 (1983). I have tried to fashion a rule that respects both of these principles.

For the foregoing reasons, I shall deny the IDA Defendants' motion for summary judgment.